Exhibit B

ROBERT SOUTHWICK                10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                              3:06-CV-00127

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HEIDI JURISCH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )
FKA DISTRIBUTING CO., d/b/a             )
HOMEDICS, INC.; KROGER CO.,             )
d/b/a FRED MEYER and/or FRED            )
MEYER STORES, INC.; and WAL-            )
MART STORES, INC., d/b/a WAL-           )
MART,                                   )
                                        )
            Defendants.                 )
                                        )
_____

Case No. 3:06-cv-00127

DEPOSITION OF ROBERT E. SOUTHWICK

October 16, 2006

APPEARANCES:

      FOR THE PLAINTIFF:          MR. HOWARD J. MEYER JR.
                                  Walther & Flanigan
                                  Attorneys at Law
                                  1029 West Third Avenue
                                  Suite 250
                                  Anchorage, Alaska  99501
                                  (907-279-9999

      FOR THE DEFENDANTS:         MR. KENNETH M. GUTSCH
                                  Richmond & Quinn
                                  Attorneys at Law
                                  360 K Street, Suite 200
                                  Anchorage, Alaska  99501
                                  (907) 276-5727

      FOR THE WITNESS:            MR. ROBERT P. OWENS
                                  Assistant Municipal Attorney
                                  Department of Law
                                  632 West Sixth Avenue
                                  Suite 730
                                  Anchorage, Alaska  99501
                                  (907) 343-4545

ROBERT SOUTHWICK                10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                    3:06-CV-00127

| Page 2 | |
|---|---|

1        TABLE OF CONTENTS
2    Direct Examination by Mr. Gutsch          03
3    Cross Examination by Mr. Meyer            92
4    Redirect Examination by Mr. Gutsch       116
5    EXHIBITS MARKED:
6    6 - Hand Drawing                          18
7    7 - Hand Drawing                          30
8    8 - Hand Drawing                          35
9    9 - Photographs                           56
10   10 - Photograph                           61
11   11 - Photograph                           97
12   12 - Handwritten Note                     97
13   13 - Xerox of Stickie Note                97
14   14 - Ltr. to Ms. Jurisch from Capt. Southwick   97
15   15 - Cover of Instruction Manual for Fountain   99
16   16 - Hand Drawing                        121
17   PROFFERED EXHIBITS:
18   Nichols' Exhibit 1                        24

Page 4

1    having first been duly sworn under oath, testified as follows
2    on:
3                DIRECT EXAMINATION
4        REPORTER:  Would you state your full name for the record
5    and spell your last name, please?
6  A    Robert Earl Southwick, S-O-U-T-H-W-I-C-K.
7        REPORTER:  And a business mailing address, please?
8  A    I've just been at this station a short time but you could
9        actually use the same one as Deneen gave you.
10       REPORTER:  Okay, will do.
11 A     If we can do that.
12       REPORTER:  And do you have a telephone number or a message
13   phone?
14 A     267-5014.
15       REPORTER:  Thank you.  Counsel, you may proceed.
16   BY MR. GUTSCH:
17 Q     Captain, what is your title with the Anchorage Fire
18       Department?
19 A     Fire captain.
20 Q     All right.  How long have you worked for the
21       Anchorage Fire Department?
22 A     April 21st, I think, was 15 years.
23 Q     And how -- did you work as captain for 15 years or.....
24 A     No.
25 Q     How long have you been a captain?

Page 3

1            P R O C E E D I N G S
2        (Anchorage, Alaska - 10/16/2006)
3        REPORTER:  My name is Joseph Kolasinski, Notary Public in
4    and for the state of Alaska and court reporter for Computer
5    Matrix Court Reporters whose business address is 310 K Street,
6    Suite 200, Anchorage, Alaska.  This is the first tape in the
7    audiotape deposition of Bob Southwick taken pursuant to notice
8    by the defendants.  The case is in the United States district
9    court for the district of Alaska, Heidi Jurisch, versus, FKA
10   Distributing, et al, case number 3:06-CV-00127.  It is the 16th
11   day of October 2006.  The time is 10:32 a.m.  We are at the
12   offices of Computer Matrix Court Reporters, 310 K Street, Suite
13   200, Anchorage, Alaska.  Counsel, if you'll please identify
14   yourself for the record stating your representation starting
15   with the plaintiff's attorney.
16       MR. MEYER:  Howard Meyer, representing plaintiff.
17       MR. GUTSCH:  Ken Gutsch for defendants.
18       MR. OWENS:  Robert Owens for the municipality of
19   Anchorage.
20       REPORTER:  Thank you.  Sir, if you'll raise your right
21   hand, I'll swear you in.
22       (Oath administered)
23       MR. SOUTHWICK:  I do.
24       REPORTER:  Thank you.
25            ROBERT E. SOUTHWICK

Page 5

1  A    Since 2001, January, I believe.
2  Q    What are your job responsibilities as a captain?
3  A    To supervise my crew during emergency responses, supervise
4      them at the station during normal routine duties,
5      training, enter daily records.
6  Q    Do you have investigative responsibilities as a captain?
7  A    Limited.
8  Q    And what are your limited investigative responsibilities?
9  A    To do as best I can to determine a fire cause.
10 Q    What sort of training have you had to determine cause and
11     origin?
12 A    Well, we've had minimal official training.  We have
13     investigators -- Anchorage Fire Department
14     investigators come in occasionally and -- and give us
15     classes on it, some self study.
16 Q    Can you give me a thumbnail sketch of your education?
17 A    I have an associate degree in fire science.
18 Q    When did you obtain that degree?
19 A    1992, I believe, from the University of Alaska.
20     MR. MEYER:  Just -- Anchorage?
21 A    Anchorage, yes.
22     MR. MEYER:  I'm sorry, Ken.
23 Q    All right.  In -- did you take investigative classes as
24     part of your degree program at UAA?
25 A    There was one class that investigation was -- it was

ROBERT SOUTHWICK                    10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                                3:06-CV-00127

3 (Pages 6 to 9)

Page 6

1    actually in a fire science, one of the fire chemistry
2    -- physics and chemistry classes that -- that delved
3    into investigation somewhat.
4  Q  When you say one of -- how much time did you spend on that
5    fire investigative class -- element of that class?
6  A  It was a portion of one semester.
7  Q  What -- what size portion?  Just -- I know we're going
8    back awhile but as -- as an estimate how much would you
9    estimate?
10 A  I would say maybe about -- maybe a quarter, roughly.
11 Q  So one quarter of one class was devoted to investigation?
12 A  Uh-huh.  (Affirmative)
13 Q  And that class was sometime before 1991 or 1992?
14 A  Before '92.
15 Q  Before '92.  Do you have any training in electrical
16    engineering?
17 A  No.
18 Q  Let me take you to the day of this fire.  What was
19    the date of this fire?  Was it April 12th, 2004?
20    Does that sound about right?
21 A  Sounds about right.  I'm sure we can look in there and
22    find it.
23 Q  Why don't you -- feel free to reference that just so we
24    know if we have the right date.
25 A  It says here Monday, April 12th.

Page 7

1  Q  Okay.
2  A  2004.
3  Q  What -- what time did you go on duty that day?
4  A  Officially we start at 0900 but generally speaking we're
5    usually there at least 15, 20 minutes or more ahead of
6    time.
7  Q  So around 8:45.  Do you recall showing up for work that
8    day around 8:45 a.m.?
9  A  I don't specifically recall that day but I think -- I
10    normally get there 15 to 30 minutes early.
11 Q  All right.  So somewhere around 8:45 was your normal
12    routine?
13 A  Sure.
14 Q  What time was this run?
15 A  According to the incident report it says 091726 is when
16    the alarm came in.
17 Q  9:17, and what -- what time did you get there?
18 A  Well, according to this about one second later.
19    That's what it says here.  It was very close to the
20    station.  So it would have been a very fast response.
21 Q  All right.  Within a few minutes then?
22 A  Probably less than two minutes.
23 Q  Okay.  So probably less than two minutes after it --
24    the call comes in at 9:17 you arrive at the -- the
25    Jurisch house?

Page 8

1  A  (No audible response)
2  Q  All right.  How long were you there total?
3  A  Let's see, last scene had cleared at 10:16:07 and we would
4    in all probability have been the last unit, first in --
5    first -- last out, usually.
6  Q  Okay.  So you'd have been there almost an hour.  Do you
7    have an independent recollection of this incident?
8  A  Yeah, somewhat.
9  Q  All right.  Did you have any runs before this 9:17
10    fire?
11    MR. MEYER:  That day?
12 A  That day, yeah.
13 A  I have no idea.
14 Q  Okay.
15 A  I -- I don't know.
16 Q  All right.
17 A  I don't remember that.
18 Q  Do you recall any runs after the Jurisch fire on April
19    12th, 2004?
20 A  No.
21 Q  All right.
22 A  It's a busy station.  I'm sure there were.
23 Q  Okay.  Tell me what happened, what you recall about the
24    Jurisch fire.
25 A  Went on location, saw smoke showing from the front of the

Page 9

1    structure, the living room window had been broken out,
2    front door was ajar, people standing there saying that no
3    one was home.  My firefighter and I prepared to make
4    entry, next arriving unit I believe was medics.  Told them
5    to pull a second line, begin doing a search.  Went in,
6    fire was to the -- primarily to the right of us.  We
7    knocked it out like very fast.  It -- we just put it out
8    within seconds pretty much and went searching the house.
9  Q  All right.  What else did you do?  You searched the house
10    for what?
11 A  Possible victims.
12 Q  Okay.  I take it you didn't find any?
13 A  No.
14 Q  How fast did you put out the fire?
15 A  Within seconds.
16 Q  Then what did you do?
17 A  Let the place air out, looked to see if we've missed any
18    fire anywhere.  We usually let the place try to -- try to
19    let the place air out and cool off and then go back in and
20    start looking for cause and overhauling.
21 Q  What does -- what does overhauling mean?
22 A  Overhauling is a pretty thorough search for any
23    hidden fire and removing items that might be
24    smoldering that can be left behind to reignite.
25 Q  All right.  Did you find any items during your overhaul

ROBERT SOUTHWICK                10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                    3:06-CV-00127

4  (Pages 10 to 13)

Page 10

1    search?
2  A   Did we find any items, what do you mean?
3  Q   That needed to be overhauled.
4  A   Well, anything that's been significantly burnt is
5      considered an item that needs to be removed from the
6      structure.
7  Q   Did you guys remove anything that was significantly burnt
8      from the structure?
9  A   Sure, a number of items.
10 Q   What did you remove from the structure?
11 A   Burnt furniture, burnt furnishings like drapes, that
12     sort of thing.
13 Q   Do you have an independent recollection of moving --
14     removing furniture from the house?
15 A   Yes.
16 Q   All right. Which furniture did you remove from the
17     house?
18 A   Specifically I remember there was some kind of wooden
19     furniture like end-table type items from the -- east, west
20     -- southwest corner of the living room. Eventually we
21     removed the couch after we had taken some pictures and --
22     and tried to find the cause. We don't -- we don't remove
23     things before we've looked for a cause. We do that after.
24     We did remove the couch.
25 Q   So you look for a cause first and then you removed these

Page 11

1      pieces of furniture. What else did you remove besides the
2      end -- besides the end table and the couch?
3  A   There was a molten glob of some kind of ornamental little
4      fountain, as it turns out. It wasn't -- it wasn't clear
5      at first that that's what it was. That was one of the
6      items.
7  Q   What else did you remove besides -- besides those three
8      items, the end table, the couch, the molten glob of
9      ornamental fountain?
10 A   Well, there would be other things that came from the
11     kitchen I believe because they had gotten charred. So the
12     guys would pull things off the counters that could be
13     smoldering and left behind to reignite. I mean I don't
14     have an inventory of -- of every item that came out of
15     that place.
16 Q   Okay. But I'm just asking for the best of your
17     recollection. I know we're going back two and a half
18     years. Do you recall taking anything else out from.....
19 A   The couch.
20 Q   The couch?
21 A   Specifically.
22 Q   All right. Besides the couch, the end table, this glob of
23     an ornamental fountain, do you recall taking anything else
24     out?
25 A   Not specifically.

Page 12

1  Q   All right. You said you had taken notes -- or,
2      excuse me, did you take any notes during the process?
3  A   Yes.
4  Q   All right. Have you made a search for your notes in
5      response to this subpoena?
6  A   Not since the subpoena because everything I had was
7      gone years ago.
8  Q   Okay. How -- how many notes did you take?
9  A   The only notes I took were describing photographs.
10 Q   Was this after the fact, after you left the scene?
11 A   No. The notes I would have written down would have
12     been when I took the photograph. Otherwise I
13     wouldn't have remembered if it was photograph one or
14     three or whatever.
15 Q   Okay. So you.....
16 A   There was one other note and that was after we were able
17     to find the -- the model number, or whatever it was, of
18     the -- of the fountain.
19 Q   Okay. And.....
20 A   That was after we left the scene.
21 Q   Have you searched -- okay. So the notes regarding the
22     photos that you took were taken contemporaneously with --
23     with the photographing?
24 A   Yes.
25 Q   How many photos did you take?

Page 13

1  A   I don't remember how many. It wasn't a lot.
2  Q   Was it more than 10?
3  A   No.
4  Q   Was it more than five?
5  A   I don't remember.
6  Q   And did you yourself take the photos?
7  A   Yes.
8  Q   Okay. Why did you take those photos?
9  A   Well, that's pretty common. You know, if you think
10     you have -- the area of origin, you want to take some
11     pictures of it just to describe where the fire
12     started.
13 Q   Okay. And is there a policy or procedure that the fire
14     department has with regard to taking photos of a fire?
15 A   It's -- in the course of investigating photos are
16     encouraged because they describe better than you can
17     describe with words what you find. We take the
18     photographs. We just -- we describe what it is that we're
19     taking pictures of. That information is then put in a
20     large manilla envelope with your notes. On the outside of
21     the envelope you put on the run number, the date and who's
22     sending it. And then you send it by courier through
23     normal out mail, out basket, over to the fire prevention
24     office.
25 Q   Okay. And is that what happened in this case?

ROBERT SOUTHWICK                10/16/2006              JURISCH v. FKA DISTRIBUTING, et al.
                                                                    3:06-CV-00127

5 (Pages 14 to 17)

Page 14

1  A  Yes.
2  Q  Tell me what you -- what did you take the photos with,
3     what kind of a camera?
4  A  It's a real little cheesy disposable. I don't know
5     -- it's -- they're usually yellow. So I suppose
6     that's probably one of those little Kodaks but -- but
7     they're disposable cameras.
8  Q  All right. Did you -- did you take any -- were these
9     photographs all taken at the scene?
10 A  Yes.
11 Q  Okay. So no photographs were taken away from the scene,
12    say for example at -- at the fire department itself?
13 A  No.
14 Q  And so -- just so I understand, what happened -- you took
15    these photos and you took notes of each photograph to
16    explain what the photo was about?
17 A  Uh-huh. (Affirmative)
18 Q  Where would you typically keep those notes?
19 A  I send them with the camera to the fire prevention
20    office.
21 Q  And was that done in this case?
22 A  As far as I remember, yes.
23 Q  And who developed the photos?
24 A  Once they leave the station I assume someone at
25    prevention office has them developed somewhere. I

Page 15

1     don't know where.
2  Q  Okay. And then what happens to the photos?
3  A  It's my understanding that if they believe it's worth
4     investigating or if -- if there's -- would be any
5     contention about it, then they retain them. But I don't
6     really know because this is the first time I've ever been
7     involved with anything beyond just the superficial
8     investigation and passing the information on.
9  Q  Have you ever been deposed before?
10 A  No.
11 Q  Have you ever testified in court before?
12 A  Not with the Anchorage Fire Department.
13 Q  Have you -- with whom -- have you ever testified in
14    connection with a fire cause and origin before?
15 A  Yes.
16 Q  Okay. In what capacity did you testify?
17 A  I was a firefighter for the Alaska Division of Forestry
18    for 12 years and testified in one case on a fire that
19    started out in the Big Lake area.
20 Q  Were you the investigator on that case?
21 A  So to speak.
22 Q  And why do you say to speak?
23 A  Because I was the first one arriving. So they wanted to
24    know what I saw and, you know, I just investigated to
25    the best of the ability I had at that time, which wasn't

Page 16

1     much.
2  Q  Okay. You had mentioned that there are other fire
3     investigators at the Anchorage Fire Department?
4  A  Yes, there are.
5  Q  When do you call in a fire investigator?
6  A  Well, our policy is that we call an investigator if
7     there's been like $100,000 worth of damage, a severe
8     injury or fatality or suspicion of arson. Sometimes
9     they'll just show up on their own.
10 Q  Okay.
11 A  But that's our policy.
12 Q  And I take it these fire investigators have more
13    experience than you do in investigating the cause and
14    origin?
15 A  Yes. They go to some academy.
16 Q  Do you consider yourself an expert in cause and origin?
17 A  No.
18 Q  You mentioned that the photographs would be put in a
19    manilla envelope and then sent off to the fire
20    protection office. And you assume that they would
21    develop the photos?
22 A  Yes.
23 Q  What is -- what's the normal routine after that? Do you
24    ever see the photos again? Do you.....
25 A  Yeah, I've never -- I've never seen -- I don't

Page 17

1     believe I've ever seen the photos once they've been
2     sent off.
3  Q  All right. So you don't have anything to do with it again
4     after that, after that.....
5  A  Right.
6  Q  .....point where you send the photos to the fire
7     protection office?
8  A  Prevention.
9  Q  Fire prevention office.
10 A  No. This is the first time.
11 Q  All right. Let me take you back to your observations
12    at the time of this fire. I'd like you to draw for
13    me a diagram of the -- the area where you suspected
14    the fire started. I assume it's that -- is it the
15    living room of the house?
16 A  (No audible response)
17 Q  Okay. Can you -- can you draw me a larger view of
18    the whole house so I can see where the living room is
19    located from -- in relation to the rest of the house
20    and then I'll have you draw a more specific diagram
21    with regard to that particular living room.
22 A  The street's out here, the sidewalk.
23 Q  Okay. All right. How many rooms are in this house?
24 A  Well, as I remember, there was the living room, the
25    kitchen, bathroom, bedroom behind this wall.....

ROBERT SOUTHWICK                10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                  3:06-CV-00127

8 (Pages 26 to 29)

Page 26

1    certain prompts on a computer program?
2 A  Yes.
3 Q  And they came out in this narrative?
4 A  Actually you don't type it in. You just -- there's drop
5    downs. You click on whatever is closest, which doesn't
6    allow you -- you know, you're restricted to whatever is
7    available to you in the drop downs. You can't just add
8    something else. And that's where you usually try to make
9    yourself understood in your narrative.
10 Q All right. What -- what were the -- with regard to the
11   information provided in seven, paragraph seven, you say
12   that was computer generated?
13 A That's correct.
14 Q Did you have to input or provide input for the
15   computer to generate that?
16 A Yeah, that's one of the options. You know, so you find
17   whatever is the closest to what you believe happened.
18 Q And what -- what were the other options? Well, why don't
19   you just explain what were the options that you could have
20   selected?
21 A Smoking, spontaneous combustion, intentional,
22   unintentional, they're numerous. I mean there's -- each
23   one usually has a list of about -- anywhere from five to a
24   dozen options.
25 Q Each one of what?

Page 27

1 A  Each one -- each.....
2 Q  Like in.....
3 A  In each segment. You know, was it intentional or not
4    intentional? Was it misuse of a mechanical device or was
5    it a malfunction of a mechanical device? Was it -- you
6    know, there's -- in each area of cause, materials
7    contributing to flame spread, there's probably a dozen
8    different areas and each one has a drop down box. Each
9    drop down box has a variety of options to choose from.
10   But you're restricted to whatever's there. You can't
11   adlib or -- or clarify until you get to your narrative.
12 Q Okay. And what was the area that you had selected with
13   regard to the cause of this fire?
14 A The area would have been I think it's room of
15   function, which is they offer a bedroom, a living
16   room, a kitchen, bathroom, things like that. And so
17   I would have selected -- it's probably on there.
18   Well, I don't see it in here at this moment. But it
19   would have been in -- if you go -- because I know you
20   can, and probably will, you'll see that it was
21   selected as the room of function or area of function.
22 Q All right. But with regard to the cause of the fire, what
23   area were you able to select or what option did the
24   computer give you to select?
25 A Arcing or overheated wires is what I chose. The material

Page 28

1    first ignited, carpeting. Unspecified short circuit.
2 Q  Did you make any determination as to where the unspecified
3    short circuit occurred?
4 A  Well, what I found was that in the area, the general area,
5    not the point of origin because I did not fell confident
6    or competent enough to say that is the point of origin,
7    but within the area of origin the only contributing factor
8    that I -- that could not be ruled out in my best judgment
9    was that device and the wiring from it to the outlet.
10 Q The -- and what told you -- what indication did you have
11   about the device that there was a short circuit?
12 A The -- the wiring -- the electrical cord was in a big coil
13   and in that particular area the coil, all the -- the vinyl
14   or plastic coating was gone and the wires were all -- had
15   been burnt pretty thoroughly right there.
16 Q Was -- was this cord still plugged in to the wall?
17 A Yes.
18 Q Did you photograph the cord?
19 A I'm pretty sure I did.
20 Q Did you take a close up photograph of the cord to show
21   where you thought the.....
22 A I don't know how......
23 Q .....origin was?
24 A .....close up I got. But I remember trying to get a
25   picture of it.

Page 29

1 Q  Okay. And this was on the scene?
2 A  Yes.
3 Q  And -- now you mentioned that you were not confident
4    as to the -- that you could say where the -- the area
5    of origin was or the -- the specific origin was; is
6    that correct?
7 A  Yeah, the point of origin.
8 Q  The point of origin, okay. As far as the -- the area for
9    the point of origin, can -- how big is that area that
10   you're.....
11 A In this -- in this instance.....
12 Q .....you would indicate?
13 A .....we're probably talking an area of three feet, four
14   feet in diameter.
15 Q So you believe that the point of origin was in area of
16   three to four feet in diameter?
17 A Yes.
18 Q Can you draw that area of origin that you believed were
19   the -- where you believe the area of origin -- the point
20   of origin was?
21 A I'll use a dash line here.
22 Q Okay. Was the -- where was the -- you said the cord was
23   configured in a coil?
24 A Yeah, it was just sort of bunched up, coiled up.
25 Q How was it coiled?

ROBERT SOUTHWICK                10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                    3:06-CV-00127

9 (Pages 30 to 33)

Page 30

1   A   It was just kind of wound up on the -- like to describe
2       it, if you had a lot more electrical cord than was
3       necessary to reach from the device to the outlet, it was --
4       it was kind of bunched up so that -- well, I guess I
5       won't presume why but it -- it was just laying there kind
6       of.....
7   Q   All right.
8   A   .....not necessarily neat, like a neat coil, but just kind
9       of bunched up.
10  Q   Okay. I'd like you to draw a picture of where that cord
11      was. We're getting kind of -- maybe I'll have this
12      photocopied. And we can start that on a different
13      diagram.
14      MR. MEYER: Well, let's mark that one first then.
15      MR. GUTSCH: Yeah.
16      REPORTER: This will be Exhibit 7.
17              (Deposition Exhibit 7 marked)
18      (Off record)
19      (On record)
20  Q   Why don't we have you diagram where you saw the cord.
21  A   (Witness complies)
22  Q   All right. Can you show us where the cord led? Was
23      it -- first of all, was it plugged in?
24  A   Yeah.
25  Q   Okay. Where did the cord lead to?

Page 31

1   A   An outlet that was right -- right in this vicinity right
2       here.
3   Q   How long was this cord?
4   A   Probably six feet, more or less.
5   Q   Did you have -- did you have measuring tape with you?
6   A   No.
7   Q   Did you take any measurements?
8   A   No.
9   Q   And you said that the -- that the insulation was
10      burned off the cord?
11  A   Yes.
12  Q   All right. Where on the cord was the insulation burned
13      off; was it uniformly burned off or.....
14  A   No, it was pretty much.....
15  Q   .....was there a particular area?
16  A   .....where the coil -- where the cord was coiled up, that
17      was where the insulation was pretty -- pretty much
18      completely gone. I mean it was melted in other places but
19      that is where it was completely gone.
20  Q   And you say it was still plugged in at the time?
21  A   I believe it was, yes.
22  Q   Okay. Did you remove the fountain?
23  A   Yes, I did.
24  Q   All right. And why did you remove the fountain?
25  A   Because we're supposed to try to get make, model, serial

Page 32

1       number of -- of items and it was badly enough molten and
2       burned that I couldn't get any of it there at the scene.
3       So I thought I would take it back to the station to either
4       clean it up or take it apart to -- to find the make,
5       model, serial -- whatever identifying marks I could. And
6       so that's why I took it back to the station.
7   Q   All right. Did you take a photo of the cord while it
8       was still plugged in?
9   A   I'm pretty sure I took a photo of the -- I believe I
10      did. I don't specifically remember that. I just
11      remember taking pictures that I thought would show,
12      you know.....
13  Q   Okay.
14  A   .....what I thought might have caused the fire.
15  Q   All right. And if you thought the -- the coil caused the
16      fire, then you'd take a photograph of the coil?
17  A   Yeah, that's what I just said. That's what I -- I
18      tried to get pictures that I thought would show where
19      the fire started.
20  Q   All right. I take it then you didn't believe that the
21      fire had started at the fountain itself?
22  A   No, I didn't think it started at the fountain itself.
23  Q   All right. Was the coil touching the floor at the time?
24  A   It was laying on the floor, yes.
25  Q   Where was it in relation to the couch?

Page 33

1   A   It was right there at the end of the couch. I don't
2       remember if it was under the couch but it was right
3       there at the end of the couch.
4   Q   Okay. Was it -- was the couch on top of any part of the
5       cord?
6   A   I don't believe it was sitting on the cord. You mean
7       like a leg or something?
8   Q   Yeah.
9   A   I -- I don't believe so but I don't remember it in
10      that detail.
11  Q   All right. So it's possible; you just don't recall?
12  A   It's possible.
13  Q   Did you check to see whether there were any other sources
14      or causes of the fire?
15  A   Yes.
16  Q   What other causes did you check?
17  A   I looked to -- for signs of smoking. I don't believe
18      these people smoked. We didn't find any signs that
19      anyone had been smoking in the home. I looked for
20      things like candles or heating devices. There were
21      no other things like that in -- in that area.
22  Q   Was there a candle in the fountain?
23  A   I don't think there was a candle in the fountain. If
24      there was, it -- it melted away and was no longer
25      noticeable. But I don't -- I don't think there was.

ROBERT SOUTHWICK                10/16/2006         JURISCH v. FKA DISTRIBUTING, et al.
                                                   3:06-CV-00127

10 (Pages 34 to 37)

Page 34

1  Q  All right. So it's possible that there was a candle in
2     the fountain that had just melted away and you couldn't
3     see it?
4        MR. MEYER: I'm going to object. I'm not sure what you
5     mean. You mean manufactured with the fountain? Your question
6  is extremely unclear.
7  A  If you're asking had there been a wax candle somehow
8     sitting in, on, whatever, I suppose if there had been, it
9     could have melted away and we didn't see it. But I
10    certainly did not have that impression.
11 Q  All right. Is that common for candles to melt away in a
12    fire?
13 A  It is common. But most the time they are in some
14    kind of a receptacle and you'll -- you'll see a
15    receptacle left over.
16 Q  Did you see any potential receptacles on the end table?
17 A  I don't remember seeing anything there that made me think
18    there was a candle there.
19 Q  Did you interview Ms. Jurisch at the scene?
20 A  Briefly. I remember her arriving at some point after the
21    fire was out and spoke to her briefly about it, asked if
22    anyone smoked and she said, no. I'm pretty sure that -- I
23    remember having that conversation. Other than that we
24    didn't really talk about how the fire started. She as I
25    remember was concerned about wanting to -- as most people

Page 35

1     do, want -- wanting to see what was the extent of the
2     damage and.....
3  Q  Do you recall anything else that you talked with her
4     about?
5  A  Not in particular.
6  Q  Now your report indicates that there were candles in the
7     room. Do you recall seeing candles in the room?
8  A  Yeah, there was -- there was some kind of furniture
9     that I don't remember. I think it might have been a
10    bookcase or something over here. And -- and if I --
11    I believe there was something, a candle kind of
12    receptacle or something like that, over here on some
13    furniture over here but.....
14 Q  All right.
15 A  .....it was.....
16 Q  Can -- can you -- why don't we mark this exhibit and we'll
17    have you diagram where you saw those potential candle
18    receptacles.
19    REPORTER: Exhibit 8 marked.
20             (Deposition Exhibit 8 marked)
21 A  (Witness complies)
22 Q  All right. It sounds like -- was it sitting on the
23    edge of this piece of furniture, at the end of this
24    piece of furniture?
25 A  I don't remember exactly how or where. I just -- I

Page 36

1     remember something about there was a candle over here. I
2     didn't think it was terribly important because it -- it
3     was outside the area of the worst fire damage.
4  Q  All right. Now your narrative here in paragraph
5     seven.....
6        MR. MEYER: Objection, I think that's not his narrative
7  he's testified.
8  Q  All right. We clarified that. Can you write down seven
9     there. So we know what paragraph we're talking about.
10    There is a sentence in there that says the material first
11    ignited was carpeting. Do you see that, sir?
12 A  Yes.
13 Q  Was that your input?
14 A  That's one of the -- that's one of the generated, you
15    know, material first ignited. So carpeting would be
16    -- in this case it was my opinion that the carpeting
17    ignited and -- and it's -- and it's one of those that
18    we're always not sure about. It's like, okay, did
19    the -- do we say the wire ignited first and ignited
20    the carpeting? It's -- it's just one of the
21    restrictions that we have in the process of -- of
22    trying to fill out this report that it doesn't always
23    come across as being really clear.
24 Q  All right. In your mind if you had handwrote it, you
25    would have written out what?

Page 37

1  A  I believed the overheating wires ignited the carpet. That
2     was -- that was my suspicion.
3  Q  All right. In your mind is there any distinction between
4     overheating wires and arcing?
5  A  Well, sure. Yeah, there is.
6  Q  What's your understanding of arcing?
7  A  Arcing is an electrical jump between two -- you know, two
8     items where you actually get a spark that arcs across.
9     Overheating is just the wires being -- overheating,
10    they're getting too hot, too much resistance, becoming too
11    hot.
12 Q  All right. Did you make any investigation into the -- the
13    amount of volts.....
14 A  No.
15 Q  .....that the cord was carrying?
16 A  No.
17 Q  Did you ever attempt to get an exemplar?
18 A  No.
19 Q  All right. Let me ask you this, after you took the
20    fountain out of the house what did you do with it?
21 A  I took it back to the fire station and then we opened it
22    up on the work bench and -- in order to find some
23    identifying marks, nomenclature.
24 Q  Okay. Did you take the cord with -- or the wire with?
25 A  Yeah, that -- that came with it I believe. I'm pretty

ROBERT SOUTHWICK                    10/16/2006              JURISCH v. FKA DISTRIBUTING, et al.
                                                           3:06-CV-00127

11 (Pages 38 to 41)

Page 38

1   sure it did.
2 Q  Was it attached?
3 A  Yeah.
4 Q  In that room were there any other electrical
5    appliances?
6 A  Not that I remember in that particular spot.
7 Q  Were there other appliances in other spots in that room?
8 A  Well, I -- I believe there probably were. I don't
9    remember them specifically.
10 Q  And do you know where they were? Do you have a
11    recollection of where these other electrical appliances
12    were?
13 A  No, not specifically.
14 Q  And why do you believe there were other.....
15 A  Well, it's a living room.
16 Q  .....electrical appliances?
17 A  I'm sure there were probably other electrical devices in
18    there.
19 Q  All right. Did you take any other notes besides noting
20    where the photos -- what the photos depicted?
21 A  Not at the scene.
22 Q  All right. Did you take notes away from the scene?
23 A  Yeah. I wrote down what we found in the -- the fountain.
24 Q  And what did you find in the fountain? I take it you took
25    it back to the lab at the fire department?

Page 39

1 A  We took it to the fire station.
2 Q  Fire station.
3 A  And on the workbench we got it opened up and we found
4    a brand name and model or serial number, something.
5 Q  And what did you do with that information?
6 A  I entered it into the -- into the narrative.
7 Q  When you say entered it into the narrative, is it -- is
8    the narrative what is reflected in Exhibits 1 and 3?
9 A  Well, this is -- this wasn't -- this isn't the
10    original narrative.
11 Q  Okay. How do we get a copy of the original narrative?
12 A  Well, you've already been through that before. But
13    just to explain again, I have no idea how it happened
14    but in some -- some way the run was changed from a
15    fire, structure fire, to a cancelled en route.
16    Cancelled en route will eliminate much of this. So I
17    had to go back, I don't know how long, a couple days
18    I think. It wasn't too long. But I had to go back
19    and reenter this information.
20 Q  When you took the fountain did you tell Ms. Jurisch that
21    you were taking it?
22 A  I don't remember actually if I told her at that time. I
23    know I told her later because then they asked about it and
24    I explained what happened.
25 Q  Okay. When did you next talk with her after the fire,

Page 40

1    after you went back to the station?
2 A  It was a couple days, a few days. During my days off I
3    believe I had a note to call her. And I remember -- I
4    think I called her back and explained what happened.
5 Q  That is your theory of how the -- the fire was caused?
6 A  No. Where was the fountain.
7 Q  Okay. That you guys had taken the fountain?
8 A  Yes.
9 Q  What else did you tell her at that time?
10 A  Well, I don't remember specifically what I had told
11    her. But I explained why we took it and what
12    happened to it. And -- and I -- and I don't remember
13    my exact words. So I won't.....
14 Q  Why did you take the fountain?
15 A  So that we could.....
16 Q  Check the serial number?
17 A  .....find some identifying marks.
18 Q  And you did find the identifying marks and you found
19    marks identifying the -- the brand.....
20 A  Uh-huh. (Affirmative)
21 Q  .....model and serial number?
22 A  Uh-huh. (Affirmative)
23 Q  And you inputted those into the -- into the computer
24    narrative?
25 A  Uh-huh. (Affirmative)

Page 41

1    MR. MEYER: Let me just interrupt just because this is not
2    video, if you could use yes or no.....
3 A  Oh, I'm sorry. Yes.
4 Q  Yeah. And then you talked with Ms. Jurisch?
5 A  Yes.
6 Q  All right. And you told her why you had taken it?
7 A  Yes.
8 Q  All right. Did you tell her about -- did you tell her
9    that you thought the fountain had started the fire?
10 A  Well, I'm sure I probably explained that that was why
11    we took it, because it was a potential cause. I
12    don't -- I don't believe I ever said to anybody,
13    written or spoken, that that started the fire. But I
14    said that it could have and I couldn't rule it out.
15 Q  Okay. And that's your opinion today?
16 A  That is my opinion today.
17 Q  The fountain could have started the fire and you can't
18    rule it out?
19 A  That's correct.
20 Q  What happens -- what happened to the fire -- or, excuse
21    me, what happened to the fountain after that?
22 A  We left it on the workbench and went off shift, came back,
23    and the other crew because I did not tell them what it was
24    or why it was there, thought it was just some junk and
25    threw it out. And then I don't know if it was that

ROBERT SOUTHWICK                  10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                                          3:06-CV-00127

Page 42

1    particular shift or the next shift when I got the note to
2    talk to Ms. Jurisch. And so I went out and climbed in the
3    dumpster and rummaged through the dumpster trying to find
4    it but it had been -- the dumpster had already been
5    emptied by that point.
6  Q   What was the note from Ms. Jurisch that you got at that
7    point?
8  A   It wasn't from her I don't think. I think she had called
9    the station and one of the other personnel from the other
10   shift just left a note for me to call her back.
11 Q   Okay. But there was no substantive information in that
12   note?
13 A   No.
14 Q   And when did that occur; was that after you had first
15   talked with her over the phone?
16 A   No. This was what led up to me talking to her on the
17   phone.
18 Q   I see. Now when you left with the fountain did Ms.
19   Jurisch see you leave?
20 A   I don't.....
21 Q   That is when you left the house.....
22 A   Yeah.
23 Q   .....the scene of the fire. Did she see you leave?
24 A   I -- I don't know.
25 Q   How would you describe her demeanor at the fire?

Page 43

1  A   She was upset, pretty -- I would say her demeanor was
2    pretty typical of somebody who has just had a fire in
3    their home.
4  Q   Did she watch you work at that point?
5  A   I don't know if she watched us.
6  Q   Did she -- did she ask you what -- what started the fire?
7  A   I imagine she probably did. I don't specifically
8    remember telling her. I -- I would guess that --
9    because I would -- I would never tell anybody at the
10   scene. You know, because usually the answer is we're
11   -- we're investigating. We're trying to figure it
12   out. I don't think that I would say at the scene
13   that -- that this something specifically -- unless it
14   was just overtly obvious.
15 Q   All right. Let me ask you this, if there had been say a
16   serious injury as a result of this fire, would you have
17   done anything differently as far as the investigation
18   process is concerned?
19   MR. MEYER: Objection, speculation. But go ahead.
20 Q   As a matter of routine.
21 A   As a matter of routine if someone had been seriously
22   injured, a regular investigator would have been called.
23 Q   Who is the regular investigator? Is there more than one
24   or is there.....
25 A   There's more than one. At that time his last name was

Page 44

1    McDonald. I don't remember his first name right now.
2    He's -- he's no longer with the fire department but his
3    last name was McDonald.
4  Q   Okay. At that time that was the fire investigator?
5  A   Uh-huh. (Affirmative)
6  Q   Does the fire department have written procedures for
7    investigating fires and handling evidence?
8  A   It just says that we will make a earnest attempt, you
9    know, based on training and experience to determine
10   the cause of all fires. And in classes that we've
11   had, you know, the -- the chain of custody, which is,
12   you know, where evidence goes from the first time
13   it's handled until it's secured. The chain of
14   custody is it goes from us to prevention and once
15   they have it -- it is my belief or understanding that
16   they have some means of securing it. But I don't
17   know physically what that is.
18 Q   All right. They have something like an evidence locker?
19 A   I believe so, yes.
20 Q   All right. So did you have an intention to forward
21   this fountain to prevention?
22 A   Well, I wasn't sure what -- I was -- I thought whether we
23   -- I wasn't sure what we were going to do with it. And I
24   thought we might just bring it back to the -- the scene or
25   if we got a call and prevention wanted it, we'd give it to

Page 45

1    them. As I said it was thrown out.
2  Q   And did you make an attempt to find out who threw it
3    out?
4  A   No, not specifically. It was just, hey, you guys, do
5    you know where that went and they said, oh, yeah,
6    some -- somebody threw that out.
7  Q   All right. And you didn't ask who -- who it was that
8    threw it out?
9  A   No. It was one of the -- one of the personnel on the
10   other shift.
11 Q   Is there someone in charge of that other shift we could
12   talk with to find out who may have thrown it out?
13 A   Every shift has a captain.
14 Q   Who was the captain of that other shift?
15 A   I don't remember if that was -- if it was C shift, it
16   would have been Lon Hecimovich. If it was B shift,
17   at that time it could have been either Mayojack (ph),
18   captain, or perhaps it would have been Diane Rush. I
19   can't remember who was the B shift captain right
20   then.
21 Q   All right. How do you spell.....
22 A   Hecimovich?
23 Q   .....Lon Hecimovich; how do you spell his name?
24 A   H-E-C-I-M-O-V-I-C-H.
25 Q   Okay. It sounds like there were -- there were just two

ROBERT SOUTHWICK                    10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                                            3:06-CV-00127

13 (Pages 46 to 49)

Page 46

1    shifts?
2  A   There's -- well, three.
3  Q   Three shifts.
4  A   We're one.  We are A shift.  Hecimovich is C shift.  And
5      either Rush or Mayojack would have been B shift.
6  Q   All right.  And approximately how many days after the fire
7      was the fountain thrown out?
8  A   It was either the day after or two days after.  But I
9      think it was the day after.
10 Q   And why would you think it was the day after?
11 A   Because I don't remember coming back to work and seeing it
12     there.
13 Q   Okay.
14 A   I mean it might have been but I don't particularly
15     remember that.
16 Q   Do you recall the day of the week that this occurred on?
17 A   No.
18 Q   If it were a Monday.....
19     MR. MEYER:  If what were a Monday?
20 Q   If the day of the week when the fire happened was a
21     Monday, would you be able to say when the fountain was
22     thrown out?
23 A   It would either be a Tuesday -- let's see, Monday,
24     Wednesday -- it would either have been Tuesday or
25     Thursday.

Page 47

1  Q   Okay.  Is that when you came back on shift, Tuesday or
2      Thursday?
3  A   No.  I would have been on shift Wednesday and I might have
4      been on shift Friday.  But I don't know which shift of our
5      cycle that this happened on.
6  Q   Okay.  But your best estimate is this was thrown out one
7      to two days after the fire?
8  A   Yes.
9  Q   All right.  When -- did you call Ms. Jurisch back
10     after the fire?
11 A   I called when I got the note.
12 Q   Okay.  And what did you guys talk about in your
13     conversation?
14 A   She wanted to know where the little fountain thing was.
15 Q   How did she know that it was gone?
16 A   Well, probably -- my guess is she probably got a copy
17     of the report and then, I don't know, maybe her
18     insurance company wanted to see it or -- she didn't
19     say why she knew it was gone but she just asked about
20     it.
21 Q   All right.  And what did you tell her?
22 A   I told her we took it back to the station to see if
23     we could identify it.  And then I said that it was
24     thrown out but I'll see if we can still retrieve it.
25     And that's when I went diving in the dumpster and I

Page 48

1      couldn't get it.
2  Q   Okay.
3  A   Couldn't find it.
4  Q   Did you have any conversations with Ms. Jurisch after
5      that?
6  A   I don't -- I don't think so.  I -- I don't remember
7      having any conversations after that.
8  Q   All right.  When did Ms. Jurisch first get a copy of the
9      report?
10 A   I have no idea.  She wouldn't come to me for that.
11 Q   She would -- she would go to somebody like Ms. Nichols.
12 A   Yes.
13 Q   All right.  Now did you have any other reason for
14     taking the fountain back to the station.....
15 A   No.
16 Q   .....other than to identify it?
17 A   No.
18 Q   Why couldn't you have identified it at Ms. Jurisch' house?
19 A   Well, didn't want to -- just didn't want to spend the
20     time trying to pry this little thing apart there.  We
21     just figured it would be simpler to do it at the
22     station.
23 Q   And -- and you said that all the identifying information
24     was in the initial report that you had created?
25 A   Uh-huh.  (Affirmative)

Page 49

1  Q   But that somehow it got erased over?
2  A   Yes.  I don't know how that happened.
3  Q   And do you know of any way to identify the make, model and
4      serial number of this fountain at this point?
5  A   I think -- I think -- I don't remember if it was
6      Deneen specifically, but someone from records asked
7      do we have anything and I said, well, I already sent
8      the pictures in.  I'll look around.  And it seems
9      like I did find a little sticky note that we had
10     written the information on.  And I'm pretty sure I
11     sent that -- that to her.
12 Q   To Ms. Nichols?
13 A   I believe it was her, yes.  I remember -- I'm sure I
14     found that and I'm sure I sent that downtown.
15 Q   And what -- what information was on the sticky note?
16 A   It would have been whatever we found, the -- the
17     name, you know, the brand or the serial number or
18     whatever.
19 Q   All right.  Do you know if that information was ever
20     provided to Ms. Jurisch?
21 A   No, actually I really don't know if she got that or not.
22     I'd presume probably but I -- I don't know.
23 Q   Well, why do you presume that she got it?
24 A   Well, because Deneen was looking for it.  I think it was
25     Deneen.  I don't remember.  I guess I shouldn't say her

ROBERT SOUTHWICK                 10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                   3:06-CV-00127

Page 50

1   name. But I remember I was asked about it. I went
2   looking. And they asked about it because the homeowner
3   was trying to find out this information. And so my
4   suspicion was that once I turned that information in it
5   probably would have been given to Ms. Jurisch.
6  Q   All right. Are there any special credentials required to
7      become a fire investigator?
8  A   Yes.
9  Q   And what are they?
10 A   Well, I don't know what they all are. But I know
11     that they have -- they usually have to go through an
12     academy of some nature and they have to test and.....
13 Q   All right. I take it you haven't been through that.....
14 A   No, I have not.
15 Q   .....that education process? Do you recall talking with
16     Ms. -- Ms. Jurisch about whether she had any candles in
17     that area that might have been lit at the time?
18 A   I -- I think when we were in the yard I might have asked
19     her about that. But I guess I can't say definitely but
20     that seems -- it seems like we -- we might have mentioned
21     that.
22 Q   Okay. And do -- you don't recall what she said.....
23 A   No.
24 Q   .....if indeed the con -- the question was asked?
25 A   Yeah, if -- if we had it, I don't remember what -- what

Page 51

1      she might have said about it.
2  Q   All right. Were there any other parts of the fountain
3      that you did not take with you?
4  A   No, it was kind of an all or nothing type of thing.
5  Q   Okay. There would have been no reason to leave parts of
6      the fountain behind?
7  A   No.
8  Q   All right. How long did the investigation take?
9  A   It wasn't a real long time. Once the fire was out the
10     rest of the crews were doing the overhaul. I was trying
11     to figure out what happened. Less than an hour.
12 Q   Well, yeah, we know that because you -- you left after
13     about an hour, right?
14 A   Yeah, right.
15 Q   I think you said you were there about a couple
16     minutes after 9:17 and you cleared out at 10:16?
17 A   Yeah, something like that.
18 Q   All right. So it would have been less than an hour
19     for your investigation?
20 A   Yes.
21 Q   What did you do to investigate? And -- and I know you've
22     already talked about things that you've -- that you've
23     observed. But was there a system that you followed to
24     conduct this investigation?
25 A   Well, I guess my system consists of look for the

Page 52

1      indicators that lead you to where the area of the
2      fire start is. Once you get in that area look for
3      any possible causes that you can decipher. Rule out
4      what -- you know, what kinds of things didn't cause
5      it, you know, by their lack of being there or
6      whatever. And then once you've got -- you know,
7      whatever's left over then becomes your possibility.
8  Q   Did you have any instruments of any kind during the
9      investigation?
10 A   Just the camera.
11 Q   Just the camera. And did you rake through the -- the
12     ashes on the floor?
13 A   Yeah. I mean just cleared.....
14 Q   You used your hand?
15 A   Yeah, use your hands to sort of move things out of
16     the way to see.....
17 Q   Okay.
18 A   .....you know, because you usually end up with things like
19     burnt curtain that falls down. You know, that's an after
20     the fact kind of a deal.
21 Q   All right. So you -- did you get down on your hands and
22     knees and sort of sift through with your hands, sift
23     through the -- the ash with your hands?
24 A   Uh-huh. (Affirmative)
25 Q   Did anybody else do that?

Page 53

1  A   Not much. It was -- although I know it didn't seem
2      like it for her, but it was a relatively small fire
3      and the other guys were taking care of things pretty
4      quickly. I looked through -- I remember talking
5      about it with one of the other officers, probably
6      Delbert, just to kind of look and say, hey, what do
7      you think and -- and.....
8  Q   Now who -- is Delbert -- is he a police officer or is
9      he.....
10 A   He's another captain.
11 Q   He's another.....
12 A   Fire department.
13 Q   So there was another fire department captain present at
14     the time?
15 A   Uh-huh. (Affirmative)
16 Q   Why was that?
17 A   Because they send more than one engine company to a fire.
18 Q   All right. How many.....
19 A   I'm sure there was probably three other captains. It
20     would have been truck three, engine three; those both have
21     captains on them.
22 Q   All right.
23 A   I'm not sure who the third engine might have been. It
24     could have been one of -- I'm sure you could find it in
25     the report who all was there.

ROBERT SOUTHWICK                    10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                        3:06-CV-00127

18 (Pages 66 to 69)

Page 66

1      end table?
2  A   A plant pot and the -- what we later found to be a
3      fountain and I'm not sure what that little item right
4      there is, this little item right here.
5  Q   Okay. Can you circle that with your red pen and write
6      unsure?
7  A   (Witness complies)
8  Q   Okay. Did you ask Ms. Jurisch about what that item was?
9  A   I don't remember asking her about that.
10 Q   Was it -- was this the way it looked when you conducted
11     your investigation?
12 A   Yes.
13 Q   So this pot was tipped over?
14 A   Yeah, the pot got tipped over I'm sure during the
15     process of putting the fire out or.....
16 Q   When the.....
17 A   .....based on that, the pot was probably standing up
18     but.....
19 Q   And you think the -- the hose -- the stream of water from
20     the hose may have knocked it over?
21     MR. MEYER: Speculation.
22     MR. OWENS: You can answer.
23 A   Yeah -- yeah, that -- that would be my guess.
24 Q   All right.
25 A   Or during the process of cleaning up someone bumped

Page 67

1      it. But it -- it tipped over.
2  Q   All right. And this -- this other article here, this --
3      this framed receptacle of some sort, was that standing at
4      any point that you can remember?
5  A   I don't remember. I don't know that that's a framed
6      receptacle. I don't know what that is.
7  Q   All right.
8      MR. MEYER: This is the item that you've had him describe
9  as unsure?
10     MR. GUTSCH: The item that's circled by.....
11     MR. MEYER: That you now have called a framed receptacle?
12     MR. GUTSCH: The item that's circled by the red marker.
13     MR. MEYER: That says unsure, that you've called a framed
14 receptacle?
15     MR. GUTSCH: Yeah.
16     MR. MEYER: Okay. I just wanted to make sure we're
17 talking about the same thing.
18     MR. GUTSCH: Yeah.
19 Q   All right. And the item behind that is the glob of
20     fountain that you were talking about earlier, correct?
21 A   Correct.
22 Q   All right. Did you take any other items besides the
23     fountain out of the house?
24 A   No.
25     MR. MEYER: Wait a minute, you -- you mean back to the

Page 68

1      station?
2      MR. GUTSCH: Back to the station.
3      MR. MEYER: Because he's already testified to a lot of
4  things were taken out.....
5  A   Oh, right.
6      MR. MEYER: .....of the house.
7  Q   Yeah.
8      MR. MEYER: So I just want to make sure we're clear again.
9  A   Yeah. The -- this one photograph in Exhibit 10 shows some
10     sort of -- it looks like an adaptor. Do you recall seeing
11     that at the time?
12 A   I don't specifically remember it. But that may well
13     have been the -- for the fountain.
14 Q   Okay. Could that have been the cord of the fountain?
15 A   It could have been.
16 Q   All right. Do you recall taking that with you?
17 A   No.
18     MR. MEYER: You want to circle that too, whatever you've
19     called it, so that when the jury gets to see this they get to
20     know what the heck was being talked about?
21 A   (Witness complies)
22 Q   Do you know for sure whether that -- that was the fountain
23     plug?
24 A   At this point, no.
25 Q   And there appears to be some sort of, what do you call it,

Page 69

1      a power strip or something, an adaptor, to allow for
2      multiple plug ins. Is that a fair statement?
3      MR. MEYER: I'm going to object. It calls for
4  speculation.
5  A   It kind of looks like that.
6  Q   All right. Do you recall seeing any other electrical
7      appliances plugged into that?
8  A   I don't remember that.
9  Q   All right. Was that area covered by the couch?
10 A   Yes.
11 Q   All right. And it was covered by the couch at the time
12     when you were photographing?
13 A   Yes.
14 Q   All right. Did you inquire with Ms. Jurisch whether
15     she had any cats or animals?
16 A   I don't remember asking that question.
17 Q   Can cats or animals gnaw on electrical equipment?
18 A   Yes, they can.
19 Q   Do you know what a droop loop is?
20 A   The term sounds familiar. I can't recall off the top
21     of my head what that means.
22 Q   All right. Do you -- do you know if there was any
23     water in the fountain at the time.....
24 A   I don't remember.....
25 Q   .....when you were there?

ROBERT SOUTHWICK            10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                              3:06-CV-00127

20 (Pages 74 to 77)

Page 74

1    MR. GUTSCH: I'm going to.....
2    MR. MEYER: So mischaracterizes his testimony.
3    MR. GUTSCH: I'm going to object to your speaking
4  objections.
5    MR. MEYER: Okay, you can. But I really have never seen
6  anyone mutilate someone's testimony as much as you are here
7  today.
8  A   I don't know that there was anything binding it. I -- it
9      -- it was just bare wires all kind of bunched up.
10 Q  Okay. You don't recall seeing any -- anything binding the
11     wires into a coil?
12 A  No.
13 Q  And you didn't inquire about the homeowner's maintenance
14     and use of the.....
15 A  I said no before.
16 Q  .....the fountain at all? Okay. And you didn't take any
17     photographs of the fountain back at the station when it
18     was on your workbench?
19 A  No.
20 Q  Is it -- would it be fair to say that your -- it is your
21     routine to photograph the source of the point of -- or let
22     me back up. Is it your routine to photograph the point of
23     origin....
24 A  We frequently do that, yes.
25 Q  .....that you suspect?

Page 75

1  A   The area of origin.
2  Q   The area of origin. Is it your routine to photograph the
3      point of origin?
4  A   Not being the investigator, I don't usually try to be as
5      specific as that, which I -- I try to at least show where
6      it started and then.....
7  Q   Okay.
8  A   .....give my best determination.
9  Q   As we sit here today do you have an opinion to a
10     reasonable degree of certainty as to what started this
11     fire?
12     MR. MEYER: Mischaracterizes the level of proof required
13  in the state of Alaska. It's more probable than not, not
14  certainty. So objection to your form of question.
15 A  So, what, I'm supposed to give you my opinion; is that
16     what you're asking for?
17 Q  No. Do you understand the question?
18 A  Maybe not. Go again.
19 Q  As we sit here today do you have an opinion to a
20     reasonable degree of certainty as to what caused this
21     fire?
22     MR. MEYER: Same objection. Go ahead.
23 A  All -- all I can tell you is that I was pretty certain
24     that is the area that it started and that I couldn't rule
25     that out.

Page 76

1  Q   Okay. Did you determine the path of the fire?
2  A   Yes.
3  Q   And what did you determine the path of the fire to be?
4  A   That it started in that corner by the end of the
5      couch, moved up across through the corner, broke the
6      windows and went out across the top of the ceiling.
7  Q   Were the windows broken when you got there?
8  A   Yes.
9  Q   Now in viewing the photos of Exhibit 9 can you
10     identify the hot spots?
11 A  The hottest areas in this photo are this area from the
12     floor going up the wall, going across the end of the
13     couch.
14 Q  All right. Can you -- let me give you another -- I don't
15     want you to write on that same photograph. Let me give
16     you another copy, which we can mark as the next exhibit.
17     MR. MEYER: This is a copy of photo number 9-1, right?
18     MR. GUTSCH: Yeah, and we'll mark this separately.
19 Q  Can you draw for me the hot spots in that photograph?
20 A  (Witness complies)
21 Q  All right. And that's your -- you've basically drawn a V;
22     is that correct?
23 A  Yes, that's correct.
24 Q  What -- what was the normal color of the paint on the
25     wall?

Page 77

1  A   I don't know. The paper of the sheetrock is burned
2      off. So I don't know what -- I don't remember what
3      the color was. But by looking at this it was kind of
4      a beige.
5  Q   All right. Do you know what was up here above the end
6      table?
7  A   No, I don't.
8  Q   And did you ask whether -- or make any inquiry or
9      investigate whether there was anything else plugged
10     into this multi-outlet unit here?
11 A  Not that I remember.
12 Q  And just for the record, we're looking at Exhibit 10. Now
13     is there any kind of written protocol and policies and
14     procedures that the Anchorage Fire Department has for
15     investigating a fire?
16 A  I told you before it's our policy to -- to the best of our
17     ability determine the cause of all fires.
18 Q  All right. And where might I find that in writing?
19 A  I don't remember the specific SOG but it could be --
20     it could be brought up.
21 Q  All right. There's an -- what is SOG; standard of op.....
22 A  Guidelines.
23 Q  Guideline. What does SOG stand for?
24 A  Standard operating guidelines.
25 Q  Standard operating guidelines. And so if we were to get a

ROBERT SOUTHWICK                10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                              3:06-CV-00127

21 (Pages 78 to 81)

Page 78

1    copy of that, that would provide us with the protocol or
2    the policy and proced -- the written policy and procedure
3    used by the fire department?
4  A  Yeah, that's basically it.
5  Q  All right. Does it go into detail as to how to
6    perform the investigation?
7  A  No.
8  Q  It just tells you to use best effort or something like
9    that?
10 A  Yes.
11 Q  Now in your -- your report I think your -- your narrative
12   says that the cause of the fire was unspecified?
13 A  Yes.
14 Q  Why did you -- tell me what -- what your options were when
15   you inputted that information into the computer program?
16 A  Unspecified was one of probably six or eight options in
17   the electrical category.
18 Q  Okay. And what are the other options?
19 A  Arcing, misuse of a mechanical device, overheating, I
20   don't remember them all. There's quite a few.
21 Q  Overheating, any -- anything else that you can recall?
22 A  Malfunctions.
23 Q  Anything else?
24 A  I can't remember them well enough to describe them
25   for your satisfaction.

Page 79

1  Q  All right. And one of those was unspecified?
2  A  Yes.
3  Q  And why did you put in unspecified?
4  A  Because I could not categorically say that's how it
5    happened. I just said I couldn't rule it out.
6  Q  Were you able to rule out a candle as a potential cause of
7    the fire?
8  A  I did not find evidence of a candle in the area of origin,
9    as I determined it.
10 Q  You did say that you thought you saw a receptacle for a
11   candle on the edge of the -- a piece of furniture?
12 A  Yes.
13 Q  Okay. Can you draw for me what that receptacle looked
14   like?
15 A  No.
16 Q  You can't make any kind of effort? Was it standing up?
17   Was it lying on its side?
18 A  I don't remember.
19 Q  All right. Do you remember the color?
20 A  No.
21 Q  Did you ask Ms. Jurisch about that receptacle?
22   MR. MEYER: Asked and answered. Go ahead.
23 A  I told you that before. I remember we said something
24   about candles. I don't remember specifically what it was.
25 Q  Okay. But you don't -- you don't recall talking with her

Page 80

1    about that receptacle then.....
2  A  The candle receptacle?
3  Q  .....just generally about candles.
4  A  Yes.
5  Q  Is there -- is there any kind of evidence log that the
6    fire department keeps?
7  A  If it's at the prevention office, I don't know.
8  Q  All right. But not at the station?
9  A  No.
10 Q  Did you interview anybody else with regard to the
11   fire?
12 A  No, I don't think so.
13 Q  And how long did your interview with Ms. Jurisch last
14   approximately?
15 A  It was brief; just maybe five minutes.
16 Q  Okay. Does the Anchorage Fire Department have a policy
17   and procedure with regard to notification of
18   manufacturer's products that they believe may have caused
19   a fire?
20 A  I guess I don't know what the policy is. I know that we
21   try -- that's one of the reasons why we try to get model,
22   serial numbers, that sort of thing. But I think it's a
23   statistical -- for statistical purposes. I don't know if
24   they go back and contact all the manufacturers. It's not
25   done from the station anyway.

Page 81

1  Q  What -- what would you have done with that information
2    once you got the -- the brand, model.....
3  A  It would go in the report.
4  Q  .....and serial number? It would have gone in your
5    narrative or the report -- the incident report?
6  A  Uh-huh. (Affirmative)
7  Q  Is there a formal cause and origin report that the
8    fire department issues?
9  A  Just what's in these CAD reports.
10 Q  If the -- if the fire investigator were to issue a
11   report, would he use the same format, the same CAD
12   format?
13 A  He has -- he has an entire section of their -- of
14   their own.
15 Q  And what do you mean by that?
16 A  When you do the report there's an area for the basic
17   information, time, address. Who responds is a
18   section. Parties involved is a section. The fire
19   section is where I enter the information regarding
20   cause and spread and extent of damage. Then there's
21   the narratives. But there's also a section in there
22   -- it comes under arson.
23 Q  Yeah.
24 A  But the investigator has that area there. And I
25   don't think it has to be restricted to arson but

ROBERT SOUTHWICK                10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                  3:06-CV-00127

Page 82

1     that's the section that he uses.
2  Q  Okay. Can you show me that section in the report that we
3     have?
4  A  It's not in there.
5  Q  It's not in there. What happens, is there a separate
6     section generated by the computer when the fire
7     investigator.....
8  A  Yes.
9  Q  .....provides his report? Are you familiar with the
10    National Fire Protectors Association's procedures?
11 A  Some of them. There's many.
12 Q  Okay. How did you become familiar with them?
13 A  Training.
14 Q  And what are their procedures with regard to investigating
15    a fire like this where you believe it's caused by a
16    fountain?
17 A  Well, NFPA with regards to this, I -- I don't know. But
18    they -- they cover just about every single aspect. So I
19    am familiar with some of NFPA. It's -- it's massive.
20    It's like the building code. It's huge.
21 Q  Yeah. Do they have specific procedures with regard to
22    investigating this type of fire?
23 A  I don't know. I -- I presume, probably.
24 Q  But you don't know what they are?
25 A  I already said that, no.

Page 83

1     MR. MEYER: Actually I'll interpose the speculation based
2     upon his earlier answer.
3     MR. OWENS: We've been at this about two hours and 45
4     minutes.
5     MR. MEYER: Yeah, and this is to last four hours and I get
6     to ask my questions and.....
7  Q  Did you check the -- was there some sort of attic in the
8     house?
9  A  We call it a cock loft.
10 Q  A what?
11 A  Cock loft. It's not a full attic, per se. It's
12    just.....
13 Q  All right.
14 A  .....the unheated space above the ceilings.
15 Q  All right. Did anybody check that during the course of
16    your investigation?
17 A  Not for investigation other than looking for fire
18    extension.
19 Q  And what did -- what did you find?
20 A  I wasn't the one who did it but we just got an all
21    clear. There was no fire in the -- in the attic.
22 Q  No fire extension in the -- in the attic. What does that
23    mean?
24 A  The fire did not progress into the attic.
25 Q  Have you assisted a fire -- the fire investigator in

Page 84

1     performing investigations?
2  A  Yeah, sometimes we get called on to hold lights for
3     them, that sort of thing.
4  Q  Okay. Did you have any lights available to you when you
5     photographed in this case?
6  A  There would have been lights that could have been brought
7     in off the truck company.
8  Q  All right. But you -- you didn't use any lights?
9  A  I don't remember -- I don't remember that we used
10    lights. The pictures are pretty dark. We might not
11    have.
12 Q  Did you search the house for any ashtrays?
13 A  We did look around for ashtrays.
14 Q  Did you find any ashtrays?
15 A  I don't remember finding ashtrays.
16 Q  Did you search the house for any other candles?
17 A  We did not search the entire house for candles that I
18    remember.
19 Q  Did you see any candles in the house?
20 A  The only candles that I was interested in were the ones in
21    the room where the fire started. If there were other
22    candles elsewhere in the house, I would not have given it
23    much -- much thought.
24 Q  Why not?
25 A  Because they weren't in the fire -- in the room where the

Page 85

1     fire started.
2  Q  Okay. So you were focused on the room where the fire
3     started?
4  A  Uh-huh. (Affirmative)
5  Q  All right. What were the weather conditions like at
6     the time of the fire?
7  A  It was cold, snowy. I don't remember much beyond
8     that.
9  Q  What was the wind like?
10 A  I don't remember.
11 Q  Have you ever examined any other of these types of
12    fountains?
13 A  I have never seen one before.
14 Q  All right. This was the first time you had seen at least
15    the remnants of a fountain?
16 A  Yes.
17 Q  And have you ever prepared a cause and origin report?
18 A  Nothing outside of what goes into our -- our regular
19    fire reports.
20 Q  All right. Do -- does a fire investigator ever videotape?
21 A  I don't know.
22 Q  Did you check for any signs of forced entry?
23 A  The door had been -- had been forced when we got there.
24    It was ajar.
25 Q  Okay.

ROBERT SOUTHWICK                    10/16/2006           JURISCH v. FKA DISTRIBUTING, et al.
                                                                            3:06-CV-00127

Page 86

1  A    The neighbor said he -- he'd -- the neighbor said he
2       forced it open. I don't remember if he said he
3       kicked it or what.
4  Q    And what was his name?
5  A    I don't remember.
6  Q    What did he look like?
7  A    I don't remember.
8       MR. MEYER: I gave you the name as part of the
9  disclosures, Ken.
10      MR. GUTSCH: What was his name?
11      MR. MEYER: Read the disclosures. I don't know. They're
12 in the disclosures.
13 Q    When you got there were the -- any lights on in the
14      house?
15 A    I -- I guess I can't specifically say but my impression
16      is, no.
17 Q    And why do you say that your impression is that there were
18      no lights on in the house?
19 A    Because when I looked at the house -- usually if there's
20      lights on you'll see a glow and you look for that to tell
21      you how far the smoke has progressed. And sometimes you
22      want to be careful that you don't mistake glow from fire
23      from glow from lights. So I don't remember seeing any --
24      any lights elsewhere in the house.
25 Q    All right. Did you ask this gentleman who forced

Page 87

1       open the door what he did after that?
2  A    I just said -- he says, yeah -- something to the effect,
3       well, yeah, I -- I kicked the door or I broke the door in.
4       I looked in there and hollered, something to that effect.
5       And based on that, what he said, that's why he told me no
6       one's home. But we don't ever just trust that
7       information.
8  Q    I see. So he -- you think he was kicking open the door --
9       I know this requires speculation but you think he was
10      kicking open the door to find out if somebody else was in
11      there, based on what he told you?
12 A    That would -- yeah, that would be my impression.
13 Q    All right. Now was there a plant in this pot, this red
14      pot that's knocked over that's reflected in.....
15 A    I don't know.
16      MR. MEYER: I'm going to object based upon relevancy,
17 unless we've.....
18 Q    .....Exhibit 9?
19      MR. MEYER: .....got some horticulture test going here.
20 A    I -- I don't remember if there was a plant in that pot.
21 Q    Okay. Let me ask you this, if you knew with 20/20
22      hindsight that you'd be asked to testify, would you have
23      done anything differently.....
24      MR. MEYER: Speculation.....
25 Q    .....with regard to your response to this fire?

Page 88

1       MR. OWENS: If you know, that's a speculated --
2  speculative question.
3  A    Well, based on this experience I'd call an investigator
4       rather than sit here and go round and round. But that's
5       not our policy.
6  Q    Do you know if the media reported the fire?
7  A    I presume they probably did.
8  Q    Was there a reporter there or did a reporter contact you?
9  A    I don't remember. There's almost always a reporter.
10 Q    But do you recall being contacted by a reporter?
11 A    No.
12 Q    Was there -- when you say there's almost always a
13      reporter, do they show up on the scene?
14 A    Sure.
15 Q    They're -- are they listening to the.....
16 A    I have no idea.....
17 Q    .....911 calls?
18      MR. MEYER: Speculation.
19 A    .....how they get there. They just show up.
20 Q    All right. What type of carpeting was -- did they have
21      there?
22      MR. MEYER: Objection, vague.
23 A    Short carpeting, pretty common place.
24 Q    What kind of material was it made out of?
25 A    Carpeting.....

Page 89

1       MR. MEYER: Objection.....
2  A    .....material.
3       MR. MEYER: .....speculation.
4  Q    You can't identify the material.....
5  A    No.
6  Q    .....other than it was just your standard carpeting
7       material and it was a short cut? What was the temperature
8       like inside the home when you got there?
9  A    Hot.
10 Q    How hot?
11      MR. MEYER: Hot enough you had to wear protective
12 equipment.
13 Q    Yeah.
14 A    Inside of that you can't tell exactly.
15 Q    All right.
16      MR. MEYER: Do you have any idea how much longer you're
17 going to be, Ken? Because I -- I have another depo that starts
18 at 2:00. I will be leaving here at 1:30.
19      MR. GUTSCH: I'm almost done.
20      MR. MEYER: And I will be continuing this depo because of
21 that.
22      MR. GUTSCH: Well, why don't we just.....
23      MR. MEYER: No, ask all your questions. Have at it. Be
24 done.
25      MR. GUTSCH: All right.

ROBERT SOUTHWICK                    10/16/2006              JURISCH v. FKA DISTRIBUTING, et al.
                                                                    3:06-CV-00127

Page 90

1  Q   What was the next -- as I understand it you were contacted
2      by Ms. Jurisch and she -- you called her back and you
3      explained to her what had happened, that the -- that you
4      no longer had the fountain, right?
5  A   Yes.
6  Q   What was the next time that you were contacted by anybody
7      about this case?
8  A   I believe it was by Deneen. I think it was Deneen. It
9      might have been someone else from admin asking if I had
10     any of the information about that fountain.
11 Q   And when did that occur approximately? Was it.....
12 A   I would.....
13 Q   Was it this year or are we going back.....
14 A   Oh, no, we're -- we're talking days after.
15 Q   Okay.
16 A   Maybe a week but shortly after.
17 Q   All right. Did -- were you ever contacted by an adjuster
18     for an insurance company?
19 A   I don't think so. I don't remember.
20 Q   All right. When you -- you were contacted by Deneen
21     approximately one week after the accident what did you
22     tell her, basically what you've told us about having.....
23 A   Yeah, and she says, well, if you have anything, because
24     there was this screw up on the -- the run being changed
25     and then so I wasn't able to put that information in about

Page 91

1      the -- the fountain. Then I looked and I'm sure I found --
2      I was sure that I found a note that had the model number
3      and stuff like that on it. And I thought -- I was -- I
4      was pretty sure I sent it downtown because I didn't want
5      to go back and then change again any information in the
6      report.
7  Q   All right. Were you ever contacted after that, you know,
8      after Deneen contacts you a week later approximately?
9  A   Somewhere in this process I had to write a letter.
10     Sometime in that time frame I was asked to write a letter
11     -- I'm pretty sure it was to Ms. Jurisch, explaining what
12     had happened. And I'm sure that I must have had it cc'd
13     to our deputy chief of operations. I'm pretty sure.
14     Yeah, he might have been the one who asked me to -- to
15     write it.
16 Q   Okay.
17 A   And it was in that time frame. I -- I don't remember
18     precisely but somewhere in that time frame of -- that
19     might have been a week or two later, something like
20     that.
21 Q   Did anybody ask you to preserve the fountain as evidence?
22 A   Well, no, not -- because the fountain was gone like --
23     you know, like the next day or two days later.
24 Q   At any point in time no one asked you to preserve the
25     fountain as evidence?

Page 92

1  A   No.
2  Q   Do you think having the wire that was connected to the
3      fountain would be helpful in determining the cause of the
4      fire?
5      MR. MEYER: Objection, speculation.
6  A   I don't know.
7      MR. GUTSCH: I'm almost done with my questions. Bear with
8  me here.
9  Q   And I take it based on your previous testimony that you
10     had never seen this type of fountain before, you're not
11     familiar with the -- the installation or maintenance or
12     operation instructions?
13 A   No, I'm not.
14 Q   Did you see any animals around either the inside or the
15     outside of the house at the time when you guys were there
16     responding to the fire?
17 A   I don't remember any animals.
18     MR. GUTSCH: I'm done.
19          ROBERT E. SOUTHWICK
20 testified as follows on:
21          CROSS EXAMINATION
22 BY MR. MEYER:
23 Q   I'll try and cover as much as I can here. You were asked
24     a question and at one point you said could you
25     categorically determine the cause of the fire; and when

Page 93

1      you used that word categorically did you mean 100 percent
2      certainty?
3  A   Yes.
4  Q   Okay. Is it your understanding based upon your training
5      and experience that you got to this far relatively quickly
6      after it started?
7  A   Yes, we were there quick.
8  Q   And can you tell that by the extent of damage to the
9      house?
10 A   Yes.
11 Q   And the quicker one gets to a fire, is it easier to
12     determine the area of -- let's see, what's -- what do you
13     use, the.....
14 A   Area of origin.
15 Q   Area of origin, does that make it easier to find the area
16     of origin?
17 A   Yes. There's less burned area to sort through.
18 Q   And in this particular case was there actually very little
19     area that actually was touched by fire?
20 A   Relative to the entire house, yes. It was a fairly
21     small percentage of the house.
22 Q   So when you first get there you look for where the area,
23     the general area, where the fire had started?
24 A   Right. Once it's under control and we've cleared the air
25     so we can see, yes, that's what we start trying to do.

ROBERT SOUTHWICK                    10/16/2006         JURISCH v. FKA DISTRIBUTING, et al.
                                                        3:06-CV-00127

25 (Pages 94 to 97)

Page 94

1  Q   And is it fair to say you determined based upon your
2      training and experience that that was the southwest corner
3      of this house?  I think you called it the southwest
4      corner.
5  A   Yes.
6  Q   It's that corner that we see in this -- in all -- the
7      photographs that depict a corner.....
8  A   Picture 10.
9  Q   .....say picture 10?  That's the corner there?
10 A   Yes.
11 Q   And once you determine the area where the fire started,
12     then you look for possible causes?
13 A   Yes.
14 Q   Okay.  And in the actual area where you determined
15     that the fire had started am I fair to say that the
16     only -- and I'll use the terms of your report, the --
17     the only logical ignition source was the wiring to
18     that fountain?
19 A   That was what I determined, yes.
20 Q   And you were asked questions about furniture and candles.
21     And you drew an area where you thought you sort of
22     remembered where that had been?
23 A   Yes, there was some piece of furniture there; a bookcase
24     type of piece of furniture, as I remember.
25 Q   And if you look at, for example -- well, the photographs

Page 95

1      that you took, you took those before you moved furniture,
2      right?
3  A   Yes.
4  Q   Okay.  Looking at photo 9-3, do you see any bookcase
5      or anything in that area underneath the two windows?
6  A   No.
7  Q   So there's no furniture in that area; isn't that
8      correct?
9  A   Yes, that's correct.
10 Q   And so is it probably then -- further then to the left
11     that that piece of furniture was?
12 A   It was probably sitting where this white mark is on the
13     wall.
14 Q   Okay.
15 A   So -- so somebody did move that piece of furniture
16     before we started taking pictures.
17 Q   And -- and the white mark signifies what to you?  Is
18     it.....
19 A   There was something sitting there during the fire
20     protecting that piece of the wall.
21 Q   Does it also signify that that's not where the fire was?
22 A   That white spot is -- correct, there -- that would signify
23     that there had not been fire at -- at that place right
24     there.
25 Q   And since fire goes in a V-pattern would it tell you that

Page 96

1      the fire had to be further over to the right of that?
2  A   Based on how it appeared to me that was -- that was my,
3      you know, estimation of the -- of the scene.
4  Q   And you saw no candles over in the area of origin?
5  A   No, I did not find candles in the -- in the area that.....
6  Q   And correct me if I'm wrong, the reason you don't really
7      care about candles sitting in the bedroom is because it's
8      -- if there's no fire in the bedroom, the heat from a
9      candle in the bedroom didn't jump all the way across the
10     house to the living room, right?
11 A   Correct.
12 Q   Now paragraph seven -- and the next two that are
13     underneath I'm not going to ask you to write eight and
14     nine in there, but in what is paragraph seven, eight and
15     nine, you say that's computer generated?
16 A   Correct.
17 Q   But it's generated solely upon input by someone such -- in
18     this case yourself?
19 A   Correct.
20 Q   You've mentioned some notes here.  You've mentioned a
21     letter here today.
22     MR. MEYER:  If you could mark these, whatever the next
23 three numbers are.
24     REPORTER:  12, 13, and 14, and 11 I'm going to mark that
25 picture that.....

Page 97

1      MR. MEYER:  Let me just hand you that then.
2      MR. GUTSCH:  Hang on, let's get you that picture here
3  before we forget.
4      (Off record comments -- looking for picture)
5      (Deposition Exhibits 11, 12, 13, 14 marked)
6  Q   Just to go back, the picture when I was asking you whether
7      it showed fire over in the area where the furniture that
8      you had testified about thinking was over on the -- what
9      would be the south wall, I guess, the photograph we were
10     looking at was photograph -- well, 9-1 showed -- 9-3 I
11     mean shows that area, correct?
12 A   Yes.
13 Q   And 9-4 shows that area?
14 A   Yes.
15 Q   And it's -- it's on the left hand side.....
16 A   Yes.
17 Q   .....of the photograph?  It's that white area that shows
18     up on.....
19 A   Correct.
20 Q   And just so we can orient the -- number three, there's
21     something there.  That's a light receptacle hanging from
22     the ceiling?
23 A   Correct.
24 Q   I'm going to hand you Exhibits 12, 13, and 14.  These are
25     documents that the plaintiff provided to the defense in

ROBERT SOUTHWICK                 10/16/2006            JURISCH v. FKA DISTRIBUTING, et al.
                                                      3:06-CV-00127

Page 102

1  Q   That's the highest of the firefighter.....
2  A   Firefighter series, yes.
3  Q   Okay. So you would take 11 and a half years and
4      subtract.....
5  A   The -- five or.....
6  Q   Subtract maybe five -- up to five years?
7  A   Yeah.
8  Q   So about six years, six and a half?
9  A   Yes.
10 Q   And then what was your next rank?
11 A   Captain.
12 Q   And at the time of this fire you'd been a captain for
13     about a year?
14 A   Yes. Well, a little more than that.
15 Q   And you mentioned battalion earlier. There's three
16     battalions in Anchorage?
17 A   Correct.
18 Q   Do you know how many employees the whole fire
19     department has, approximately?
20 A   About 300.
21 Q   Do you know approximately how many captains there are?
22 A   There's about 20 -- about 60 -- about 60.
23 Q   And how many people above captain are there? What,
24     there's a battalion commander?
25 A   On each shift on the line, what we call on the line,

Page 103

1      there's three per shift. So nine above captain until you
2      start becoming, you know, like administrative chiefs and --
3      and that sort of thing.
4  Q   Okay. In photograph 10, I'm getting the picture from your
5      testimony that when you look at photographs you can see
6      evidence where things have been because of the lack of
7      certain things like that?
8  A   Correct.
9  Q   And do you see any evidence at all that other than that
10     one plug that's in that receptacle, do you see any
11     evidence in that photograph that any other plugs were in
12     that receptacle?
13 A   Not by looking at that picture you can't tell if anything
14     else had been there.
15 Q   Okay. And you were asked about surge protectors and
16     things like that. And isn't that part -- in part
17     what fuse boxes are for in a house?
18 A   In -- in part.
19 Q   Okay. Other than that outlet do you see any other
20     electrical outlets in the area?
21 A   Not that I can readily make out.
22 Q   Other than the fountain did you see any other electrical
23     appliances in the area?
24 A   I -- I don't remember seeing any other electrical
25     appliances.

Page 104

1  Q   Do you recall whether or not you had to lift the sofa to
2      take the fountain out?
3  A   No, I don't think we had to lift it. To get the fountain
4      out, no, the fountain was sitting on that end table thing.
5      So, no, we didn't have to lift it to get the fountain out.
6  Q   Okay. Now you testified that the investigators are called
7      when there's more than -- when -- I guess when you
8      determine that -- what appears to you to be more than
9      $100,000 worth of damage?
10 A   Correct.
11 Q   Is that structure or contents or just.....
12 A   $100,000 in -- in total. You know, they don't --
13     they don't try to hold us to that. But when -- when
14     you've had like major loss of the structure, you
15     know, and you're starting to guess it's in the
16     $100,000 range, that's -- that's one of the criteria.
17 Q   And here you didn't believe it got.....
18 A   No.
19 Q   .....quite to that extent.....
20 A   No.
21 Q   .....correct?
22 A   Correct.
23 Q   And then severe injury, fatality; you had no evidence that
24     there was either of that?
25 A   Correct.

Page 105

1  Q   And arson; and that's a criminal matter, correct?
2  A   Correct.
3  Q   Seeing no evidence of any one of -- you didn't see any
4      signs that there was anything criminal going on here, did
5      you?
6  A   No, I did not.
7  Q   In the absence of that -- satisfying those criteria for
8      calling in the fire investigator, is -- does the fire
9      department then entrust to you the obligation to determine
10     the fire's cause and origin?
11 A   Pretty much, yes.
12 Q   And that's based upon your experience and training?
13 A   Yes.
14 Q   And in this case, what, about 25 years at that time of
15     this fire, correct?
16 A   Total.
17 Q   Based upon your 25 years of training and experience, on a
18     more probable than not basis is it your opinion as the
19     investigator from station six that responded to this fire
20     was it your opinion that the fire was caused by the molten
21     glob of plastic or -- or was associated with that
22     fountain?
23     MR. GUTSCH: Objection, leading, foundation.
24 A   It was -- it was my opinion that the fire started in
25     that area and that in -- within that area one thing

ROBERT SOUTHWICK                     10/16/2006          JURISCH v. FKA DISTRIBUTING, et al.
                                                         3:06-CV-00127

28  (Pages 106 to 109)

Page 106

1     that I could not rule out was the wiring to that
2     decorative fountain.
3  Q  Was there anything else in that area that you could not
4     rule out other than the wiring of that decorative
5     fountain?
6  A  I found no other potential ignition sources.
7  Q  And then just so we cover it, you -- you mentioned having
8     to write a letter and you thought someone else had asked
9     you to write it to Ms. Jurisch.
10 A  Yes.
11 Q  Exhibit 14, does that appear to be a copy of that letter?
12 A  Yes.
13 Q  And that's dated April 30th, 2004?
14 A  Correct.
15 Q  And you -- you mentioned in your testimony before seeing
16    this that you believed you had cc'd somebody.  Is there a
17    cc on this?
18 A  Yes, Deputy Chief Schrage.
19 Q  And is that who you were referring to that you thought had
20    asked you to do this?
21 A  Yes, I believe Chief Schrage asked that I would send her
22    an explanation.
23 Q  Now it says here, as we had discussed at the scene the
24    fire positively started in the corner behind the couch and
25    end table.  You -- you agree with that statement still?

Page 107

1  A  Yes, that was definitely my opinion.
2     MR. GUTSCH:  Objection, leading, foundation.
3  Q  And then you tried your best to eliminate possibilities
4     until finding what could have been the actual cause; is
5     that what you did?
6  A  That's what -- yes, that's what I said.  That's what I
7     did.
8  Q  And the only thing that you mention in your letter is the
9     decorative fountain on the end -- on the end table?
10 A  That's -- it says the decorative fountain that was on the
11    end table was one possible cause which I could not rule
12    out.
13 Q  And as you've testified here today there were no other
14    possible causes that you could see in the area of origin?
15 A  Not that I could find.
16 Q  And you looked?
17 A  Yes.  Yes, we looked.
18 Q  And the only identifying mark to this -- this glob of
19    plastic that you were able to find was -- it was a
20    pump and Exhibit 13 is the information that you were
21    able to glean from that.....
22 A  That's correct.
23 Q  .....pump?
24 A  Correct.
25 Q  Or from that plastic glob?

Page 108

1  A  Correct.  That was inside.  That's what -- that's why we
2     had to open it up to find any identifying mark and that
3     was what we were able to find.
4  Q  Looking at Exhibit 10 is the location of that electrical
5     receptacle higher than the location of where you found the
6     coiled wire?
7  A  Yes.
8  Q  Okay.  Assuming there's no defect with the wiring or
9     with the electrical appliance, can fires just start
10    by something being plugged into electricity?
11    MR. GUTSCH:  Objection, foundation.
12 Q  In your experience, 25 years of experience working with
13    fires?
14    MR. GUTSCH:  Foundation.
15 A  Not -- in my experience there are more contributing
16    factors.  Just plugging something in doesn't typically
17    cause a fire.
18    MR. MEYER:  Let me take a short break.  Hopefully I'm
19 going to be done.
20    (Off record)
21    (On record)
22 Q  The camera that you took the pictures, you mentioned it
23    was one of these disposable cameras.  Do you only use one
24    disposable camera per fire?
25 A  Yes.

Page 109

1  Q  Okay.  The case around Big Lake that you talked about, is
2     that the Big Lake fire that occurred just a few years ago?
3  A  No.  That -- this was quite awhile -- quite awhile
4     before that.
5  Q  Okay.  In your letter, which is Exhibit, what, 14, you say
6     in here -- there's a sentence that says I went back and
7     reconstructed the data but no longer had the model and
8     serial numbers to reenter.  Now your letter is dated April
9     30th.  The report appears to me to be dated -- it was
10    generated at least no later than 4/19; is that correct?
11 A  Correct.
12 Q  Okay.  So when you said I went back and reconstructed
13    the data, that would have been before 4/19; is that
14    correct?
15 A  That would be correct.
16 Q  And when that other information was -- well, did you ever
17    see these notes, which are -- 12 and 13, did you see
18    those again when you were trying to reconstruct or had
19    they already been passed on?
20 A  These -- the -- number 12, which just describes that the --
21    what the pictures are supposed to be of.....
22 Q  Right.
23 A  .....I had sent on with the photos.  So this is actually
24    the first time I've ever seen this again.  And this,
25    number 13, which was the copy of the sticky note of the

ROBERT SOUTHWICK                    10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                                    3:06-CV-00127

32  (Pages 122 to 123)

Page 122

```
 1              C E R T I F I C A T E
 2   UNITED STATES OF AMERICA    )
                                 )ss
 3   STATE OF ALASKA             )
 4         I, Joseph P. Kolasinski, Notary Public in and for the
 5   state of Alaska, residing in Anchorage in said state, do hereby
 6   certify that the deponent in the foregoing matter was duly
 7   sworn to testify to the truth, and nothing but the truth;
 8         That said testimony was taken at the time and place
 9   therein stated;
10         That the testimony of said witness was recorded
11   electronically and thereafter transcribed under my direction
12   and reduced to print;
13         That the foregoing is a full, complete, and true record of
14   said testimony.
15         I further certify that I am not a relative, nor employee,
16   nor attorney, nor of counsel of any of the parties to the
17   foregoing matter, nor in any way interested in the outcome of
18   the matter therein named.
19         IN WITNESS WHEREOF I have hereunto set my hand and affixed
20   my seal this 26th day of October 2006.
21
22
                    _____
                    Joseph P. Kolasinski, Notary Public
23                  in and for the State of Alaska.
                    My Commission Expires:  03/12/2008
24
25
```

Page 123

```
 1            WITNESS CERTIFICATE
 2   RE:     JURISCH v. FKA DISTRIBUTING, et al.
     CASE NUMBER:  3:06-CV-00127
 3   DEPOSITION OF: ROBERT E. SOUTHWICK
     DATE TAKEN:  OCTOBER 16, 2006
 4
          I hereby certify that I have read the foregoing deposition
 5   and accept it as true and correct, with the following
     exceptions:
 6
     Page   Line         Description
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
     If additional paper is needed, please sign and date each sheet.
23
24   _____
          ROBERT E. SOUTHWICK      DATE
25
```