Exhibit A

Case 3:06-cv-00127-TMB    Document 43-2    Filed 01/16/2007    Page 2 of 7
ROBERT SOUTHWICK                    10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                              3:06-CV-00127

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HEIDI JURISCH,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )
                                        )
FKA DISTRIBUTING CO., d/b/a             )
HOMEDICS, INC.; KROGER CO.,             )
d/b/a FRED MEYER and/or FRED            )
MEYER STORES, INC.; and WAL-            )
MART STORES, INC., d/b/a WAL-           )
MART,                                   )
                                        )
                    Defendants.         )
_____)
Case No. 3:06-cv-00127

DEPOSITION OF ROBERT E. SOUTHWICK

October 16, 2006

APPEARANCES:

    FOR THE PLAINTIFF:            MR. HOWARD J. MEYER JR.
                                  Walther & Flanigan
                                  Attorneys at Law
                                  1029 West Third Avenue
                                  Suite 250
                                  Anchorage, Alaska  99501
                                  (907-279-9999

    FOR THE DEFENDANTS:           MR. KENNETH M. GUTSCH
                                  Richmond & Quinn
                                  Attorneys at Law
                                  360 K Street, Suite 200
                                  Anchorage, Alaska  99501
                                  (907) 276-5727

    FOR THE WITNESS:              MR. ROBERT P. OWENS
                                  Assistant Municipal Attorney
                                  Department of Law
                                  632 West Sixth Avenue
                                  Suite 730
                                  Anchorage, Alaska  99501
                                  (907) 343-4545

ROBERT SOUTHWICK                 10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                                  3:06-CV-00127

Page 34

1  Q   All right.  So it's possible that there was a candle in
2      the fountain that had just melted away and you couldn't
3      see it?
4          MR. MEYER:  I'm going to object.  I'm not sure what you
5      mean.  You mean manufactured with the fountain?  Your question
6      is extremely unclear.
7  A   If you're asking had there been a wax candle somehow
8      sitting in, on, whatever, I suppose if there had been, it
9      could have melted away and we didn't see it.  But I
10     certainly did not have that impression.
11 Q   All right.  Is that common for candles to melt away in a
12     fire?
13 A   It is common.  But most the time they are in some
14     kind of a receptacle and you'll -- you'll see a
15     receptacle left over.
16 Q   Did you see any potential receptacles on the end table?
17 A   I don't remember seeing anything there that made me think
18     there was a candle there.
19 Q   Did you interview Ms. Jurisch at the scene?
20 A   Briefly.  I remember her arriving at some point after the
21     fire was out and spoke to her briefly about it, asked if
22     anyone smoked and she said, no.  I'm pretty sure that -- I
23     remember having that conversation.  Other than that we
24     didn't really talk about how the fire started.  She as I
25     remember was concerned about wanting to -- as most people

Page 35

1      do, want -- wanting to see what was the extent of the
2      damage and.....
3  Q   Do you recall anything else that you talked with her
4      about?
5  A   Not in particular.
6  Q   Now your report indicates that there were candles in the
7      room.  Do you recall seeing candles in the room?
8  A   Yeah, there was -- there was some kind of furniture
9      that I don't remember.  I think it might have been a
10     bookcase or something over here.  And -- and if I --
11     I believe there was something, a candle kind of
12     receptacle or something like that, over here on some
13     furniture over here but.....
14 Q   All right. -
15 A   .....it was.....
16 Q   Can -- can you -- why don't we mark this exhibit and we'll
17     have you diagram where you saw those potential candle
18     receptacles.
19     REPORTER:  Exhibit 8 marked.
20                (Deposition Exhibit 8 marked)
21 A   (Witness complies)
22 Q   All right.  It sounds like -- was it sitting on the
23     edge of this piece of furniture, at the end of this
24     piece of furniture?
25 A   I don't remember exactly how or where.  I just -- I

Page 36

1      remember something about there was a candle over here.  I
2      didn't think it was terribly important because it -- it
3      was outside the area of the worst fire damage.
4  Q   All right.  Now your narrative here in paragraph
5      seven.....
6          MR. MEYER:  Objection, I think that's not his narrative
7      he's testified.
8  Q   All right.  We clarified that.  Can you write down seven
9      there.  So we know what paragraph we're talking about.
10     There is a sentence in there that says the material first
11     ignited was carpeting.  Do you see that, sir?
12 A   Yes.
13 Q   Was that your input?
14 A   That's one of the -- that's one of the generated, you
15     know, material first ignited.  So carpeting would be
16     -- in this case it was my opinion that the carpeting
17     ignited and -- and it's -- and it's one of those that
18     we're always not sure about.  It's like, okay, did
19     the -- do we say the wire ignited first and ignited
20     the carpeting?  It's -- it's just one of the
21     restrictions that we have in the process of -- of
22     trying to fill out this report that it doesn't always
23     come across as being really clear.
24 Q   All right.  In your mind if you had handwrote it, you
25     would have written out what?

Page 37

1  A   I believed the overheating wires ignited the carpet.  That
2      was -- that was my suspicion.
3  Q   All right.  In your mind is there any distinction between
4      overheating wires and arcing?
5  A   Well, sure.  Yeah, there is.
6  Q   What's your understanding of arcing?
7  A   Arcing is an electrical jump between two -- you know, two
8      items where you actually get a spark that arcs across.
9      Overheating is just the wires being -- overheating,
10     they're getting too hot, too much resistance, becoming too
11     hot.
12 Q   All right.  Did you make any investigation into the -- the
13     amount of volts.....
14 A   No.
15 Q   .....that the cord was carrying?
16 A   No.
17 Q   Did you ever attempt to get an exemplar?
18 A   No.
19 Q   All right.  Let me ask you this, after you took the
20     fountain out of the house what did you do with it?
21 A   I took it back to the fire station and then we opened it
22     up on the work bench and -- in order to find some
23     identifying marks, nomenclature.
24 Q   Okay.  Did you take the cord with -- or the wire with?
25 A   Yeah, that -- that came with it I believe.  I'm pretty

ROBERT SOUTHWICK        10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
3:06-CV-00127

18 (Pages 66 to 69)

Page 66

1   end table?
2 A   A plant pot and the -- what we later found to be a
3     fountain and I'm not sure what that little item right
4     there is, this little item right here.
5 Q   Okay. Can you circle that with your red pen and write
6     unsure?
7 A   (Witness complies)
8 Q   Okay. Did you ask Ms. Jurisch about what that item was?
9 A   I don't remember asking her about that.
10 Q   Was it -- was this the way it looked when you conducted
11     your investigation?
12 A   Yes.
13 Q   So this pot was tipped over?
14 A   Yeah, the pot got tipped over I'm sure during the
15     process of putting the fire out or.....
16 Q   When the.....
17 A   .....based on that, the pot was probably standing up
18     but.....
19 Q   And you think the -- the hose -- the stream of water from
20     the hose may have knocked it over?
21     MR. MEYER: Speculation.
22     MR. OWENS: You can answer.
23 A   Yeah -- yeah, that -- that would be my guess.
24 Q   All right.
25 A   Or during the process of cleaning up someone bumped

Page 67

1     it. But it -- it tipped over.
2 Q   All right. And this -- this other article here, this --
3     this framed receptacle of some sort, was that standing at
4     any point that you can remember?
5 A   I don't remember. I don't know that that's a framed
6     receptacle. I don't know what that is.
7 Q   All right.
8     MR. MEYER: This is the item that you've had him describe
9     as unsure?
10     MR. GUTSCH: The item that's circled by.....
11     MR. MEYER: That you now have called a framed receptacle?
12     MR. GUTSCH: The item that's circled by the red marker.
13     MR. MEYER: That says unsure, that you've called a framed
14     receptacle?
15     MR. GUTSCH: Yeah.
16     MR. MEYER: Okay. I just wanted to make sure we're
17     talking about the same thing.
18     MR. GUTSCH: Yeah.
19 Q   All right. And the item behind that is the glob of
20     fountain that you were talking about earlier, correct?
21 A   Correct.
22 Q   All right. Did you take any other items besides the
23     fountain out of the house?
24 A   No.
25     MR. MEYER: Wait a minute, you -- you mean back to the

Page 68

1   station?
2     MR. GUTSCH: Back to the station.
3     MR. MEYER: Because he's already testified to a lot of
4     things were taken out.....
5 A   Oh, right.
6     MR. MEYER: .....of the house.
7 A   Yeah.
8     MR. MEYER: So I just want to make sure we're clear again.
9 Q   Yeah. The -- this one photograph in Exhibit 10 shows some
10     sort of -- it looks like an adaptor. Do you recall seeing
11     that at the time?
12 A   I don't specifically remember it. But that may well
13     have been the -- for the fountain.
14 Q   Okay. Could that have been the cord of the fountain?
15 A   It could have been.
16 Q   All right. Do you recall taking that with you?
17 A   No.
18     MR. MEYER: You want to circle that too, whatever you've
19     called it, so that when the jury gets to see this they get to
20     know what the heck was being talked about?
21 A   (Witness complies)
22 Q   Do you know for sure whether that -- that was the fountain
23     plug?
24 A   At this point, no.
25 Q   And there appears to be some sort of, what do you call it,

Page 69

1     a power strip or something, an adaptor, to allow for
2     multiple plug ins. Is that a fair statement?
3     MR. MEYER: I'm going to object. It calls for
4     speculation.
5 A   It kind of looks like that.
6 Q   All right. Do you recall seeing any other electrical
7     appliances plugged into that?
8 A   I don't remember that.
9 Q   All right. Was that area covered by the couch?
10 A   Yes.
11 Q   All right. And it was covered by the couch at the time
12     when you were photographing?
13 A   Yes.
14 Q   All right. Did you inquire with Ms. Jurisch whether
15     she had any cats or animals?
16 A   I don't remember asking that question.
17 Q   Can cats or animals gnaw on electrical equipment?
18 A   Yes, they can.
19 Q   Do you know what a droop loop is?
20 A   The term sounds familiar. I can't recall off the top
21     of my head what that means.
22 Q   All right. Do you -- do you know if there was any
23     water in the fountain at the time.....
24 A   I don't remember.....
25 Q   .....when you were there?

ROBERT SOUTHWICK                10/16/2006        JURISCH v. FKA DISTRIBUTING, et al.
                                                  3:06-CV-00127

21 (Pages 78 to 81)

Page 78

1   copy of that, that would provide us with the protocol or
2   the policy and proced -- the written policy and procedure
3   used by the fire department?
4 A  Yeah, that's basically it.
5 Q  All right. Does it go into detail as to how to
6   perform the investigation?
7 A  No.
8 Q  It just tells you to use best effort or something like
9   that?
10 A  Yes.
11 Q  Now in your -- your report I think your -- your narrative
12   says that the cause of the fire was unspecified?
13 A  Yes.
14 Q  Why did you -- tell me what -- what your options were when
15   you inputted that information into the computer program?
16 A  Unspecified was one of probably six or eight options in
17   the electrical category.
18 Q  Okay. And what are the other options?
19 A  Arcing, misuse of a mechanical device, overheating, I
20   don't remember them all. There's quite a few.
21 Q  Overheating, any -- anything else that you can recall?
22 A  Malfunctions.
23 Q  Anything else?
24 A  I can't remember them well enough to describe them
25   for your satisfaction.

Page 79

1 Q  All right. And one of those was unspecified?
2 A  Yes.
3 Q  And why did you put in unspecified?
4 A  Because I could not categorically say that's how it
5   happened. I just said I couldn't rule it out.
6 Q  Were you able to rule out a candle as a potential cause of
7   the fire?
8 A  I did not find evidence of a candle in the area of origin,
9   as I determined it.
10 Q  You did say that you thought you saw a receptacle for a
11   candle on the edge of the -- a piece of furniture?
12 A  Yes.
13 Q  Okay. Can you draw for me what that receptacle looked
14   like?
15 A  No.
16 Q  You can't make any kind of effort? Was it standing up?
17   Was it lying on its side?
18 A  I don't remember.
19 Q  All right. Do you remember the color?
20 A  No.
21 Q  Did you ask Ms. Jurisch about that receptacle?
22   MR. MEYER:  Asked and answered.  Go ahead.
23 A  I told you that before. I remember we said something
24   about candles. I don't remember specifically what it was.
25 Q  Okay. But you don't -- you don't recall talking with her

Page 80

1   about that receptacle then.....
2 A  The candle receptacle?
3 Q  .....just generally about candles.
4 A  Yes.
5 Q  Is there -- is there any kind of evidence log that the
6   fire department keeps?
7 A  If it's at the prevention office, I don't know.
8 Q  All right. But not at the station?
9 A  No.
10 Q  Did you interview anybody else with regard to the
11   fire?
12 A  No, I don't think so.
13 Q  And how long did your interview with Ms. Jurisch last
14   approximately?
15 A  It was brief; just maybe five minutes.
16 Q  Okay. Does the Anchorage Fire Department have a policy
17   and procedure with regard to notification of
18   manufacturer's products that they believe may have caused
19   a fire?
20 A  I guess I don't know what the policy is. I know that we
21   try -- that's one of the reasons why we try to get model,
22   serial  numbers, that sort of thing. But I think it's a
23   statistical -- for statistical purposes. I don't know if
24   they go back and contact all the manufacturers. It's not
25   done from the station anyway.

Page 81

1 Q  What -- what would you have done with that information
2   once you got the the -- brand, model.....
3 A  It would go in the report.
4 Q  .....and serial number? It would have gone in your
5   narrative or the report -- the incident report?
6 A  Uh-huh.  (Affirmative)
7 Q  Is there a formal cause and origin report that the
8   fire department issues?
9 A  Just what's in these CAD reports.
10 Q  If the -- if the fire investigator were to issue a
11   report, would he use the same format, the same CAD
12   format?
13 A  He has -- he has an entire section of their -- of
14   their own.
15 Q  And what do you mean by that?
16 A  When you do the report there's an area for the basic
17   information, time, address. Who responds is a
18   section. Parties involved is a section. The fire
19   section is where I enter the information regarding
20   cause and spread and extent of damage. Then there's
21   the narratives. But there's also a section in there
22   -- it comes under arson.
23 Q  Yeah.
24 A  But the investigator has that area there. And I
25   don't think it has to be restricted to arson but

ROBERT SOUTHWICK                    10/16/2006           JURISCH v. FKA DISTRIBUTING, et al.
                                                                    3:06-CV-00127

23 (Pages 86 to 89)

Page 86

1   A    The neighbor said he -- he'd -- the neighbor said he
2        forced it open. I don't remember if he said he
3        kicked it or what.
4   Q    And what was his name?
5   A    I don't remember.
6   Q    What did he look like?
7   A    I don't remember.
8        MR. MEYER: I gave you the name as part of the
9   disclosures, Ken.
10       MR. GUTSCH: What was his name?
11       MR. MEYER: Read the disclosures. I don't know. They're
12  in the disclosures.
13  Q    When you got there were the -- any lights on in the
14       house?
15  A    I -- I guess I can't specifically say but my impression
16       is, no.
17  Q    And why do you say that your impression is that there were
18       no lights on in the house?
19  A    Because when I looked at the house -- usually if there's
20       lights on you'll see a glow and you look for that to tell
21       you how far the smoke has progressed. And sometimes you
22       want to be careful that you don't mistake glow from fire
23       from glow from lights. So I don't remember seeing any --
24       any lights elsewhere in the house.
25  Q    All right. Did you ask this gentleman who forced

Page 87

1        open the door what he did after that?
2   A    I just said -- he says, yeah -- something to the effect,
3        well, yeah, I -- I kicked the door or I broke the door in.
4        I looked in there and hollered, something to that effect.
5        And based on that, what he said, that's why he told me no
6        one's home. But we don't ever just trust that
7        information.
8   Q    I see. So he -- you think he was kicking open the door --
9        I know this requires speculation but you think he was
10       kicking open the door to find out if somebody else was in
11       there, based on what he told you?
12  A    That would -- yeah, that would be my impression.
13  Q    All right. Now was there a plant in this pot, this red
14       pot that's knocked over that's reflected in.....
15  A    I don't know.
16       MR. MEYER: I'm going to object based upon relevancy,
17  unless we've.....
18  Q    .....Exhibit 9?
19       MR. MEYER: .....got some horticulture test going here.
20  A    I -- I don't remember if there was a plant in that pot.
21  Q    Okay. Let me ask you this, if you knew with 20/20
22       hindsight that you'd be asked to testify, would you have
23       done anything differently.....
24       MR. MEYER: Speculation.....
25  Q    .....with regard to your response to this fire?

Page 88

1        MR. OWENS: If you know, that's a speculated --
2   speculative question.
3   A    Well, based on this experience I'd call an investigator
4        rather than sit here and go round and round. But that's
5        not our policy.
6   Q    Do you know if the media reported the fire?
7   A    I presume they probably did.
8   Q    Was there a reporter there or did a reporter contact you?
9   A    I don't remember. There's almost always a reporter.
10  Q    But do you recall being contacted by a reporter?
11  A    No.
12  Q    Was there -- when you say there's almost always a
13       reporter, do they show up on the scene?
14  A    Sure.
15  Q    They're -- are they listening to the.....
16  A    I have no idea.....
17  Q    .....911 calls?
18       MR. MEYER: Speculation.
19  A    .....how they get there. They just show up.
20  Q    All right. What type of carpeting was -- did they have
21       there?
22       MR. MEYER: Objection, vague.
23  A    Short carpeting, pretty common place.
24  Q    What kind of material was it made out of?
25  A    Carpeting.....

Page 89

1        MR. MEYER: Objection.....
2   A    .....material.
3        MR. MEYER: .....speculation.
4   Q    You can't identify the material.....
5   A    No.
6   Q    .....other than it was just your standard carpeting
7        material and it was a short cut? What was the temperature
8        like inside the home when you got there?
9   A    Hot.
10  Q    How hot?
11       MR. MEYER: Hot enough you had to wear protective
12  equipment.
13  Q    Yeah.
14  A    Inside of that you can't tell exactly.
15  Q    All right.
16       MR. MEYER: Do you have any idea how much longer you're
17  going to be, Ken? Because I -- I have another depo that starts
18  at 2:00. I will be leaving here at 1:30.
19       MR. GUTSCH: I'm almost done.
20       MR. MEYER: And I will be continuing this depo because of
21  that.
22       MR. GUTSCH: Well, why don't we just.....
23       MR. MEYER: No, ask all your questions. Have at it. Be
24  done.
25       MR. GUTSCH: All right.

ROBERT SOUTHWICK                10/16/2006            JURISCH v. FKA DISTRIBUTING, et al.
                                                                      3:06-CV-00127

                                                          32  (Pages 122 to 123)

Page 122

1               C E R T I F I C A T E
2  UNITED STATES OF AMERICA        )
                                   )ss
3  STATE OF ALASKA                 )
4       I, Joseph P. Kolasinski, Notary Public in and for the
5  state of Alaska, residing in Anchorage in said state, do hereby
6  certify that the deponent in the foregoing matter was duly
7  sworn to testify to the truth, and nothing but the truth;
8       That said testimony was taken at the time and place
9  therein stated;
10      That the testimony of said witness was recorded
11 electronically and thereafter transcribed under my direction
12 and reduced to print;
13      That the foregoing is a full, complete, and true record of
14 said testimony.
15      I further certify that I am not a relative, nor employee,
16 nor attorney, nor of counsel of any of the parties to the
17 foregoing matter, nor in any way interested in the outcome of
18 the matter therein named.
19      IN WITNESS WHEREOF I have hereunto set my hand and affixed
20 my seal this 26th day of October 2006.
21
22
              Joseph P. Kolasinski, Notary Public
23            in and for the State of Alaska.
              My Commission Expires:  03/12/2008
24
25

Page 123

1               WITNESS CERTIFICATE
2  RE:       JURISCH v. FKA DISTRIBUTING, et al.
   CASE NUMBER:  3:06-CV-00127
3  DEPOSITION OF: ROBERT E. SOUTHWICK
   DATE TAKEN:  OCTOBER 16, 2006
4
       I hereby certify that I have read the foregoing deposition
5  and accept it as true and correct, with the following
   exceptions:
6
   Page  Line          Description
7
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
   If additional paper is needed, please sign and date each sheet.
23
24 _____
         ROBERT E. SOUTHWICK     DATE
25