UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HEIDI JURISCH,                    )
                                  )
              Plaintiff,          )
                                  )
     v.                           )
                                  )
FKA DISTRIBUTING CO., d/b/a       )
HOMEDICS, INC.; KROGER CO.,       )
d/b/a FRED MEYER and/or FRED      )
MEYER STORES, INC.; and WAL-      )
MART STORES, INC., d/b/a WAL-     )
MART,                             )
                                  )
              Defendants.         )
_____)
Case No. 3:06-cv-00127

DEPOSITION OF ROBERT E. SOUTHWICK

October 16, 2006

APPEARANCES:

   FOR THE PLAINTIFF:       MR. HOWARD J. MEYER JR.
                            Walther & Flanigan
                            Attorneys at Law
                            1029 West Third Avenue
                            Suite 250
                            Anchorage, Alaska   99501
                            (907-279-9999

   FOR THE DEFENDANTS:      MR. KENNETH M. GUTSCH
                            Richmond & Quinn
                            Attorneys at Law
                            360 K Street, Suite 200
                            Anchorage, Alaska   99501
                            (907) 276-5727

   FOR THE WITNESS:         MR. ROBERT P. OWENS
                            Assistant Municipal Attorney
                            Department of Law
                            632 West Sixth Avenue
                            Suite 730
                            Anchorage, Alaska   99501
                            (907) 343-4545

Computer Matrix Court Reporters     PH - 907-243-0668                    jpk@gci.net
                                    FAX - 907-243-1473   Exhibit ___1___  sahile@gci.net

                                                         Page __1__ of __9__

Page 2

```
 1              TABLE OF CONTENTS
 2   Direct Examination by Mr. Gutsch          03
 3   Cross Examination by Mr. Meyer            92
 4   Redirect Examination by Mr. Gutsch       116
 5   EXHIBITS MARKED:
 6   6 - Hand Drawing                          18
 7   7 - Hand Drawing                          30
 8   8 - Hand Drawing                          35
 9   9 - Photographs                           56
10   10 - Photograph                           61
11   11 - Photograph                           97
12   12 - Handwritten Note                     97
13   13 - Xerox of Stickie Note                97
14   14 - Ltr. to Ms. Jurisch from Capt. Southwick   97
15   15 - Cover of Instruction Manual for Fountain   99
16   16 - Hand Drawing                        121
17   PROFFERED EXHIBITS:
18   Nichols' Exhibit 1                        24
19
20
21
22
23
24
25
```

Page 3

```
 1              PROCEEDINGS
 2          (Anchorage, Alaska - 10/16/2006)
 3         REPORTER: My name is Joseph Kolasinski, Notary Public in
 4   and for the state of Alaska and court reporter for Computer
 5   Matrix Court Reporters whose business address is 310 K Street,
 6   Suite 200, Anchorage, Alaska. This is the first tape in the
 7   audiotape deposition of Bob Southwick taken pursuant to notice
 8   by the defendants. The case is in the United States district
 9   court for the district of Alaska, Heidi Jurisch, versus, FKA
10   Distributing, et al, case number 3:06-CV-00127. It is the 16th
11   day of October 2006. The time is 10:32 a.m. We are at the
12   offices of Computer Matrix Court Reporters, 310 K Street, Suite
13   200, Anchorage, Alaska. Counsel, if you'll please identify
14   yourself for the record stating your representation starting
15   with the plaintiff's attorney.
16         MR. MEYER: Howard Meyer, representing plaintiff.
17         MR. GUTSCH: Ken Gutsch for defendants.
18         MR. OWENS: Robert Owens for the municipality of
19   Anchorage.
20         REPORTER: Thank you. Sir, if you'll raise your right
21   hand, I'll swear you in.
22         (Oath administered)
23         MR. SOUTHWICK: I do.
24         REPORTER: Thank you.
25              ROBERT E. SOUTHWICK
```

Page 4

```
 1   having first been duly sworn under oath, testified as follows
 2   on:
 3              DIRECT EXAMINATION
 4         REPORTER: Would you state your full name for the record
 5   and spell your last name, please?
 6   A    Robert Earl Southwick, S-O-U-T-H-W-I-C-K.
 7         REPORTER: And a business mailing address, please?
 8   A    I've just been at this station a short time but you could
 9   actually use the same one as Deneen gave you.
10         REPORTER: Okay, will do.
11   A    If we can do that.
12         REPORTER: And do you have a telephone number or a message
13   phone?
14   A    267-5014.
15         REPORTER: Thank you. Counsel, you may proceed.
16   BY MR. GUTSCH:
17   Q    Captain, what is your title with the Anchorage Fire
18   Department?
19   A    Fire captain.
20   Q    All right. How long have you worked for the
21   Anchorage Fire Department?
22   A    April 21st, I think, was 15 years.
23   Q    And how -- did you work as captain for 15 years or.....
24   A    No.
25   Q    How long have you been a captain?
```

Page 5

```
 1   A    Since 2001, January, I believe.
 2   Q    What are your job responsibilities as a captain?
 3   A    To supervise my crew during emergency responses, supervise
 4   them at the station during normal routine duties,
 5   training, enter daily records.
 6   Q    Do you have investigative responsibilities as a captain?
 7   A    Limited.
 8   Q    And what are your limited investigative responsibilities?
 9   A    To do as best I can to determine a fire cause.
10   Q    What sort of training have you had to determine cause and
11   origin?
12   A    Well, we've had minimal official training. We have
13   investigators -- Anchorage Fire Department
14   investigators come in occasionally and -- and give us
15   classes on it, some self study.
16   Q    Can you give me a thumbnail sketch of your education?
17   A    I have an associate degree in fire science.
18   Q    When did you obtain that degree?
19   A    1992, I believe, from the University of Alaska.
20         MR. MEYER: Just -- Anchorage?
21   A    Anchorage, yes.
22         MR. MEYER: I'm sorry, Ken.
23   Q    All right. In -- did you take investigative classes as
24   part of your degree program at UAA?
25   A    There was one class that investigation was -- it was
```

Page 6

1  actually in a fire science, one of the fire chemistry
2  -- physics and chemistry classes that -- that delved
3  into investigation somewhat.
4 Q When you say one of -- how much time did you spend on that
5  fire investigative class -- element of that class?
6 A It was a portion of one semester.
7 Q What -- what size portion? Just -- I know we're going
8  back awhile but as -- as an estimate how much would you
9  estimate?
10 A I would say maybe about -- maybe a quarter, roughly.
11 Q So one quarter of one class was devoted to investigation?
12 A Uh-huh. (Affirmative)
13 Q And that class was sometime before 1991 or 1992?
14 A Before '92.
15 Q Before '92. Do you have any training in electrical
16  engineering?
17 A No.
18 Q Let me take you to the day of this fire. What was
19  the date of this fire? Was it April 12th, 2004?
20  Does that sound about right?
21 A Sounds about right. I'm sure we can look in there and
22  find it.
23 Q Why don't you -- feel free to reference that just so we
24  know if we have the right date.
25 A It says here Monday, April 12th.

Page 7

1 Q Okay.
2 A 2004.
3 Q What -- what time did you go on duty that day?
4 A Officially we start at 0900 but generally speaking we're
5  usually there at least 15, 20 minutes or more ahead of
6  time.
7 Q So around 8:45. Do you recall showing up for work that
8  day around 8:45 a.m.?
9 A I don't specifically recall that day but I think -- I
10  normally get there 15 to 30 minutes early.
11 Q All right. So somewhere around 8:45 was your normal
12  routine?
13 A Sure.
14 Q What time was this run?
15 A According to the incident report it says 091726 is when
16  the alarm came in.
17 Q 9:17, and what -- what time did you get there?
18 A Well, according to this about one second later.
19  That's what it says here. It was very close to the
20  station. So it would have been a very fast response.
21 Q All right. Within a few minutes then?
22 A Probably less than two minutes.
23 Q Okay. So probably less than two minutes after it --
24  the call comes in at 9:17 you arrive at the -- the
25  Jurisch house?

Page 8

1 A (No audible response)
2 Q All right. How long were you there total?
3 A Let's see, last scene had cleared at 10:16:07 and we would
4  in all probability have been the last unit, first in --
5  first -- last out, usually.
6 Q Okay. So you'd have been there almost an hour. Do you
7  have an independent recollection of this incident?
8 A Yeah, somewhat.
9 Q All right. Did you have any runs before this 9:17
10  fire?
11  MR. MEYER: That day?
12 Q That day, yeah.
13 A I have no idea.
14 Q Okay.
15 A I -- I don't know.
16 Q All right.
17 A I don't remember that.
18 Q Do you recall any runs after the Jurisch fire on April
19  12th, 2004?
20 A No.
21 Q All right.
22 A It's a busy station. I'm sure there were.
23 Q Okay. Tell me what happened, what you recall about the
24  Jurisch fire.
25 A Went on location, saw smoke showing from the front of the

Page 9

1  structure, the living room window had been broken out,
2  front door was ajar, people standing there saying that no
3  one was home. My firefighter and I prepared to make
4  entry, next arriving unit I believe was medics. Told them
5  to pull a second line, begin doing a search. Went in,
6  fire was to the -- primarily to the right of us. We
7  knocked it out like very fast. It -- we just put it out
8  within seconds pretty much and went searching the house.
9 Q All right. What else did you do? You searched the house
10  for what?
11 A Possible victims.
12 Q Okay. I take it you didn't find any?
13 A No.
14 Q How fast did you put out the fire?
15 A Within seconds.
16 Q Then what did you do?
17 A Let the place air out, looked to see if we've missed any
18  fire anywhere. We usually let the place try to -- try to
19  let the place air out and cool off and then go back in and
20  start looking for cause and overhauling.
21 Q What does -- what does overhauling mean?
22 A Overhauling is a pretty thorough search for any
23  hidden fire and removing items that might be
24  smoldering that can be left behind to reignite.
25 Q All right. Did you find any items during your overhaul

Page 14

1  A  Yes.
2  Q  Tell me what you -- what did you take the photos with,
3     what kind of a camera?
4  A  It's a real little cheesy disposable. I don't know
5     -- it's -- they're usually yellow. So I suppose
6     that's probably one of those little Kodaks but -- but
7     they're disposable cameras.
8  Q  All right. Did you -- did you take any -- were these
9     photographs all taken at the scene?
10 A  Yes.
11 Q  Okay. So no photographs were taken away from the scene,
12    say for example at -- at the fire department itself?
13 A  No.
14 Q  And so -- just so I understand, what happened -- you took
15    these photos and you took notes of each photograph to
16    explain what the photo was about?
17 A  Uh-huh. (Affirmative)
18 Q  Where would you typically keep those notes?
19 A  I send them with the camera to the fire prevention
20    office.
21 Q  And was that done in this case?
22 A  As far as I remember, yes.
23 Q  And who developed the photos?
24 A  Once they leave the station I assume someone at
25    prevention office has them developed somewhere. I

Page 15

1     don't know where.
2  Q  Okay. And then what happens to the photos?
3  A  It's my understanding that if they believe it's worth
4     investigating or if -- if there's -- would be any
5     contention about it, then they retain them. But I don't
6     really know because this is the first time I've ever been
7     involved with anything beyond just the superficial
8     investigation and passing the information on.
9  Q  Have you ever been deposed before?
10 A  No.
11 Q  Have you ever testified in court before?
12 A  Not with the Anchorage Fire Department.
13 Q  Have you -- with whom -- have you ever testified in
14    connection with a fire cause and origin before?
15 A  Yes.
16 Q  Okay. In what capacity did you testify?
17 A  I was a firefighter for the Alaska Division of Forestry
18    for 12 years and testified in one case on a fire that
19    started out in the Big Lake area.
20 Q  Were you the investigator on that case?
21 A  So to speak.
22 Q  And why do you say to speak?
23 A  Because I was the first one arriving. So they wanted to
24    know what I saw and, you know, I just investigated it to
25    the best of the ability I had at that time, which wasn't

Page 16

1     much.
2  Q  Okay. You had mentioned that there are other fire
3     investigators at the Anchorage Fire Department?
4  A  Yes, there are.
5  Q  When do you call in a fire investigator?
6  A  Well, our policy is that we call an investigator if
7     there's been like $100,000 worth of damage, a severe
8     injury or fatality or suspicion of arson. Sometimes
9     they'll just show up on their own.
10 Q  Okay.
11 A  But that's our policy.
12 Q  And I take it these fire investigators have more
13    experience than you do in investigating the cause and
14    origin?
15 A  Yes. They go to some academy.
16 Q  Do you consider yourself an expert in cause and origin?
17 A  No.
18 Q  You mentioned that the photographs would be put in a
19    manilla envelope and then sent off to the fire
20    protection office. And you assume that they would
21    develop the photos?
22 A  Yes.
23 Q  What is -- what's the normal routine after that? Do you
24    ever see the photos again? Do you.....
25 A  Yeah, I've never -- I've never seen -- I don't

Page 17

1     believe I've ever seen the photos once they've been
2     sent off.
3  Q  All right. So you don't have anything to do with it again
4     after that, after that.....
5  A  Right.
6  Q  .....point where you send the photos to the fire
7     protection office?
8  A  Prevention.
9  Q  Fire prevention office.
10 A  No. This is the first time.
11 Q  All right. Let me take you back to your observations
12    at the time of this fire. I'd like you to draw for
13    me a diagram of the -- the area where you suspected
14    the fire started. I assume it's that -- is it the
15    living room of the house?
16 A  (No audible response)
17 Q  Okay. Can you -- can you draw me a larger view of
18    the whole house so I can see where the living room is
19    located from -- in relation to the rest of the house
20    and then I'll have you draw a more specific diagram
21    with regard to that particular living room.
22 A  The street's out here, the sidewalk.
23 Q  Okay. All right. How many rooms are in this house?
24 A  Well, as I remember, there was the living room, the
25    kitchen, bathroom, bedroom behind this wall.....

Case 3:06-cv-00127-TMB   Document 50-2   Filed 01/22/2007   Page 5 of 9

ROBERT SOUTHWICK
10/16/2006
JURISCH v. FKA DISTRIBUTING, et al.
3:06-CV-00127

9 (Pages 30 to 33)

Page 30

1  A  It was just kind of wound up on the -- like to describe
2     it, if you had a lot more electrical cord than was
3     necessary to reach from the device to the outlet, it was --
4     it was kind of bunched up so that -- well, I guess I
5     won't presume why but it -- it was just laying there kind
6     of.....
7  Q  All right.
8  A  .....not necessarily neat, like a neat coil, but just kind
9     of bunched up.
10 Q  Okay. I'd like you to draw a picture of where that cord
11    was. We're getting kind of -- maybe I'll have this
12    photocopied. And we can start that on a different
13    diagram.
14    MR. MEYER: Well, let's mark that one first then.
15    MR. GUTSCH: Yeah.
16    REPORTER: This will be Exhibit 7.
17              (Deposition Exhibit 7 marked)
18    (Off record)
19    (On record)
20 Q  Why don't we have you diagram where you saw the cord.
21 A  (Witness complies)
22 Q  All right. Can you show us where the cord led? Was
23    it -- first of all, was it plugged in?
24 A  Yeah.
25 Q  Okay. Where did the cord lead to?

Page 31

1  A  An outlet that was right -- right in this vicinity right
2     here.
3  Q  How long was this cord?
4  A  Probably six feet, more or less.
5  Q  Did you have -- did you have measuring tape with you?
6  A  No.
7  Q  Did you take any measurements?
8  A  No.
9  Q  And you said that the -- that the insulation was
10    burned off the cord?
11 A  Yes.
12 Q  All right. Where on the cord was the insulation burned
13    off; was it uniformly burned off or.....
14 A  No, it was pretty much.....
15 Q  .....was there a particular area?
16 A  .....where the coil -- where the cord was coiled up, that
17    was where the insulation was pretty -- pretty much
18    completely gone. I mean it was melted in other places but
19    that is where it was completely gone.
20 Q  And you say it was still plugged in at the time?
21 A  I believe it was, yes.
22 Q  Okay. Did you remove the fountain?
23 A  Yes, I did.
24 Q  All right. And why did you remove the fountain?
25 A  Because we're supposed to try to get make, model, serial

Page 32

1     number of -- of items and it was badly enough molten and
2     burned that I couldn't get any of it there at the scene.
3     So I thought I would take it back to the station to either
4     clean it up or take it apart to -- to find the make,
5     model, serial -- whatever identifying marks I could. And
6     so that's why I took it back to the station.
7  Q  All right. Did you take a photo of the cord while it
8     was still plugged in?
9  A  I'm pretty sure I took a photo of the -- I believe I
10    did. I don't specifically remember that. I just
11    remember taking pictures that I thought would show,
12    you know.....
13 Q  Okay.
14 A  .....what I thought might have caused the fire.
15 Q  All right. And if you thought the -- the coil caused the
16    fire, then you'd take a photograph of the coil?
17 A  Yeah, that's what I just said. That's what I -- I
18    tried to get pictures that I thought would show where
19    the fire started.
20 Q  All right. I take it then you didn't believe that the
21    fire had started at the fountain itself?
22 A  No, I didn't think it started at the fountain itself.
23 Q  All right. Was the coil touching the floor at the time?
24 A  It was laying on the floor, yes.
25 Q  Where was it in relation to the couch?

Page 33

1  A  It was right there at the end of the couch. I don't
2     remember if it was under the couch but it was right
3     there at the end of the couch.
4  Q  Okay. Was it -- was the couch on top of any part of the
5     cord?
6  A  I don't believe it was sitting on the cord. You mean
7     like a leg or something?
8  Q  Yeah.
9  A  I -- I don't believe so but I don't remember it in
10    that detail.
11 Q  All right. So it's possible; you just don't recall?
12 A  It's possible.
13 Q  Did you check to see whether there were any other sources
14    or causes of the fire?
15 A  Yes.
16 Q  What other causes did you check?
17 A  I looked to -- for signs of smoking. I don't believe
18    these people smoked. We didn't find any signs that
19    anyone had been smoking in the home. I looked for
20    things like candles or heating devices. There were
21    no other things like that in -- in that area.
22 Q  Was there a candle in the fountain?
23 A  I don't think there was a candle in the fountain. If
24    there was, it -- it melted away and was no longer
25    noticeable. But I don't -- I don't think there was.

Page 90

1  Q  What was the next -- as I understand it you were contacted
2     by Ms. Jurisch and she -- you called her back and you
3     explained to her what had happened, that the -- that you
4     no longer had the fountain, right?
5  A  Yes.
6  Q  What was the next time that you were contacted by anybody
7     about this case?
8  A  I believe it was by Deneen. I think it was Deneen. It
9     might have been someone else from admin asking if I had
10    any of the information about that fountain.
11 Q  And when did that occur approximately? Was it.....
12 A  I would.....
13 Q  Was it this year or are we going back.....
14 A  Oh, no, we're -- we're talking days after.
15 Q  Okay.
16 A  Maybe a week but shortly after.
17 Q  All right. Did -- were you ever contacted by an adjuster
18    for an insurance company?
19 A  I don't think so. I don't remember.
20 Q  All right. When you -- you were contacted by Deneen
21    approximately one week after the accident what did you
22    tell her, basically what you've told us about having.....
23 A  Yeah, and she says, well, if you have anything, because
24    there was this screw up on the -- the run being changed
25    and then so I wasn't able to put that information in about

Page 91

1     the -- the fountain. Then I looked and I'm sure I found --
2     I was sure that I found a note that had the model number
3     and stuff like that on it. And I thought -- I was -- I
4     was pretty sure I sent it downtown because I didn't want
5     to go back and then change again any information in the
6     report.
7  Q  All right. Were you ever contacted after that, you know,
8     after Deneen contacts you a week later approximately?
9  A  Somewhere in this process I had to write a letter.
10    Sometime in that time frame I was asked to write a letter
11    -- I'm pretty sure it was to Ms. Jurisch, explaining what
12    had happened. And I'm sure that I must have had it cc'd
13    to our deputy chief of operations. I'm pretty sure.
14    Yeah, he might have been the one who asked me to -- to
15    write it.
16 Q  Okay.
17 A  And it was in that time frame. I -- I don't remember
18    precisely but somewhere in that time frame of -- that
19    might have been a week or two later, something like
20    that.
21 Q  Did anybody ask you to preserve the fountain as evidence?
22 A  Well, no, not -- because the fountain was gone like --
23    you know, like the next day or two days later.
24 Q  At any point in time no one asked you to preserve the
25    fountain as evidence?

Page 92

1  A  No.
2  Q  Do you think having the wire that was connected to the
3     fountain would be helpful in determining the cause of the
4     fire?
5     MR. MEYER: Objection, speculation.
6  A  I don't know.
7     MR. GUTSCH: I'm almost done with my questions. Bear with
8     me here.
9  Q  And I take it based on your previous testimony that you
10    had never seen this type of fountain before, you're not
11    familiar with the -- the installation or maintenance or
12    operation instructions?
13 A  No, I'm not.
14 Q  Did you see any animals around either the inside or the
15    outside of the house at the time when you guys were there
16    responding to the fire?
17 A  I don't remember any animals.
18    MR. GUTSCH: I'm done.
19            ROBERT E. SOUTHWICK
20 testified as follows on:
21            CROSS EXAMINATION
22 BY MR. MEYER:
23 Q  I'll try and cover as much as I can here. You were asked
24    a question and at one point you said could you
25    categorically determine the cause of the fire; and when

Page 93

1     you used that word categorically did you mean 100 percent
2     certainty?
3  A  Yes.
4  Q  Okay. Is it your understanding based upon your training
5     and experience that you got to this far relatively quickly
6     after it started?
7  A  Yes, we were there quick.
8  Q  And can you tell that by the extent of damage to the
9     house?
10 A  Yes.
11 Q  And the quicker one gets to a fire, is it easier to
12    determine the area of -- let's see, what's -- what do you
13    use, the.....
14 A  Area of origin.
15 Q  Area of origin, does that make it easier to find the area
16    of origin?
17 A  Yes. There's less burned area to sort through.
18 Q  And in this particular case was there actually very little
19    area that actually was touched by fire?
20 A  Relative to the entire house, yes. It was a fairly
21    small percentage of the house.
22 Q  So when you first get there you look for where the area,
23    the general area, where the fire had started?
24 A  Right. Once it's under control and we've cleared the air
25    so we can see, yes, that's what we start trying to do.

Computer Matrix Court Reporters     PH - 907-243-0668           jpk@gci.net
                                    FAX - 907-243-1473   Exhibit 1   sahile@gci.net
                                                         Page 6 of 9

Page 94

1  Q  And is it fair to say you determined based upon your
2     training and experience that that was the southwest corner
3     of this house? I think you called it the southwest
4     corner.
5  A  Yes.
6  Q  It's that corner that we see in this -- in all -- the
7     photographs that depict a corner.....
8  A  Picture 10.
9  Q  .....say picture 10? That's the corner there?
10 A  Yes.
11 Q  And once you determine the area where the fire started,
12    then you look for possible causes?
13 A  Yes.
14 Q  Okay. And in the actual area where you determined
15    that the fire had started am I fair to say that the
16    only -- and I'll use the terms of your report, the --
17    the only logical ignition source was the wiring to
18    that fountain?
19 A  That was what I determined, yes.
20 Q  And you were asked questions about furniture and candles.
21    And you drew an area where you thought you sort of
22    remembered where that had been?
23 A  Yes, there was some piece of furniture there; a bookcase
24    type of piece of furniture, as I remember.
25 Q  And if you look at, for example -- well, the photographs

Page 95

1     that you took, you took those before you moved furniture,
2     right?
3  A  Yes.
4  Q  Okay. Looking at photo 9-3, do you see any bookcase
5     or anything in that area underneath the two windows?
6  A  No.
7  Q  So there's no furniture in that area; isn't that
8     correct?
9  A  Yes, that's correct.
10 Q  And so is it probably then -- further then to the left
11    that that piece of furniture was?
12 A  It was probably sitting where this white mark is on the
13    wall.
14 Q  Okay.
15 A  So -- so somebody did move that piece of furniture
16    before we started taking pictures.
17 Q  And -- and the white mark signifies what to you? Is
18    it.....
19 A  There was something sitting there during the fire
20    protecting that piece of the wall.
21 Q  Does it also signify that that's not where the fire was?
22 A  That white spot is -- correct, there -- that would signify
23    that there had not been fire at -- at that place right
24    there.
25 Q  And since fire goes in a V-pattern would it tell you that

Page 96

1     the fire had to be further over to the right of that?
2  A  Based on how it appeared to me that was -- that was my,
3     you know, estimation of the -- of the scene.
4  Q  And you saw no candles over in the area of origin?
5  A  No, I did not find candles in the -- in the area that.....
6  Q  And correct me if I'm wrong, the reason you don't really
7     care about candles sitting in the bedroom is because it's
8     -- if there's no fire in the bedroom, the heat from a
9     candle in the bedroom didn't jump all the way across the
10    house to the living room, right?
11 A  Correct.
12 Q  Now paragraph seven -- and the next two that are
13    underneath I'm not going to ask you to write eight and
14    nine in there, but in what is paragraph seven, eight and
15    nine, you say that's computer generated?
16 A  Correct.
17 Q  But it's generated solely upon input by someone such -- in
18    this case yourself?
19 A  Correct.
20 Q  You've mentioned some notes here. You've mentioned a
21    letter here today.
22    MR. MEYER: If you could mark these, whatever the next
23    three numbers are.
24    REPORTER: 12, 13, and 14, and 11 I'm going to mark that
25    picture that.....

Page 97

1     MR. MEYER: Let me just hand you that then.
2     MR. GUTSCH: Hang on, let's get you that picture here
3     before we forget.
4     (Off record comments -- looking for picture)
5     (Deposition Exhibits 11, 12, 13, 14 marked)
6  Q  Just to go back, the picture when I was asking you whether
7     it showed fire over in the area where the furniture that
8     you had testified about thinking was over on the -- what
9     would be the south wall, I guess, the photograph we were
10    looking at was photograph -- well, 9-1 showed -- 9-3 I
11    mean shows that area, correct?
12 A  Yes.
13 Q  And 9-4 shows that area?
14 A  Yes.
15 Q  And it's -- it's on the left hand side.....
16 A  Yes.
17 Q  .....of the photograph? It's that white area that shows
18    up on.....
19 A  Correct.
20 Q  And just so we can orient the -- number three, there's
21    something there. That's a light receptacle hanging from
22    the ceiling?
23 A  Correct.
24 Q  I'm going to hand you Exhibits 12, 13, and 14. These are
25    documents that the plaintiff provided to the defense in

Page 98

1  their initial disclosures. But you haven't been asked any
2  questions about these here today specifically. Is that
3  the -- your notes that you were referring to?
4  A  That -- yes, that -- that would have been.....
5  Q  12 and 13 are your notes?
6  A  This would be describing.....
7  Q  And this is 12?
8  A  Yes, number 12 describes the -- the photographs that I was
9  taking on that -- on the day of the 12th.
10 Q  And you wrote that on -- contemporaneous with the taking
11    of the photographs?
12 A  Yes.
13 Q  Okay. And then Exhibit 13 is.....
14 A  This -- this -- okay, so this was the sticky note that I
15    wrote down the information that I got off of the fountain
16    when we were back at the station.
17 Q  And can you read what it says for us?
18 A  It says Homedics. It says fount sub, fountain pump,
19    meaning submersible fountain pump. And the other
20    numbers are not too well -- I mean it looks like
21    PT80:L55-180 and WFL-rock. That would have been what
22    I was able to decipher from the labeling inside.
23    MR. GUTSCH: Excuse me, is that your handwriting?
24 A  Yeah.
25    MR. GUTSCH: Okay, can you read that again slowly?

Page 99

1  A  It appears to be PT80:L55-18 -- either a zero or a U.
2     REPORTER: 15 marked.
3             (Deposition Exhibit 15 marked)
4  Q  So WFL-rock is -- was some characteristic you saw written
5     on it?
6  A  Yes, inside.
7  Q  Okay. And I'm handing you what's been marked as Exhibit
8     15. And you'll notice on here this is the instruction
9     manual and warranty information for the WFL-rock. Does
10    that -- does that have any semblance, if you will, of the
11    molten mass of plastic that you found?
12 A  Well, more or less. It was -- it was pretty well --
13    pretty well damaged when I got it. But the
14    distinguishing thing was that there did appear to be
15    these little pedestals or layers in it.
16 Q  Okay.
17    MR. GUTSCH: Is that -- is that the one that was produced
18 in your initial disclosures?
19    MR. MEYER: Yeah.
20    MR. GUTSCH: Where'd you get that?
21    MR. MEYER: I -- I -- I -- you copied it. It's the
22 instruction manual that came with the molten mass that was in
23 the corner.
24    MR. GUTSCH: Yeah, who gave it to you though? Was it.....
25    MR. MEYER: What do you mean who gave it to me? I'm not

Page 100

1  being deposed here. I produced the document. It was -- it
2  accompanied the equipment, the fountain.
3     MR. GUTSCH: Okay. And who gave -- who gave the
4  fountain.....
5     MR. MEYER: I'm not -- you know, Ken, send a discovery
6  request. I'm not here to be deposed. I've got very little
7  time thanks to your long questioning.
8     MR. GUTSCH: It only takes two seconds to give me a name.
9  Q  Based upon your training in -- well, here, let me talk to
10    you about your training and experience. My understanding
11    is is you -- before you worked for the Anchorage Fire
12    Department you worked for.....
13 A  Alaska Division of Forestry.
14 Q  And what did you do for them?
15 A  In the 12 years I worked there I -- I had a variety of
16    jobs. I was a firefighter. I issued burn permits, did
17    public fire prevention education.....
18 Q  Would it be fair to say you were involved in working with
19    fire oriented issues for 12 years?
20 A  Yes.
21 Q  And then you went to the Anchorage Fire Department?
22 A  Yes.
23 Q  And you've been with them for 15 years as of back in
24    April?
25 A  Yes.

Page 101

1  Q  So about 27 years you've been engaged in -- in working
2     with fires?
3  A  Yes.
4  Q  And relative to your work with the Anchorage Fire
5     Department where -- where did you start at; what would be
6     your first job there?
7  A  Trainee firefighter.
8  Q  How long does that last approximately?
9  A  A year. You're on probation for one year.
10 Q  And then what do you become?
11 A  Then you're a firefighter I.
12 Q  How long are you that?
13 A  Two years.
14 Q  Then what were you?
15 A  Firefighter II.
16 Q  How long were you that, approximately?
17 A  One or two years. Two years I guess.
18 Q  Then what was your next.....
19 A  Firefighter III.
20 Q  Approximately how long?
21 A  Another year or maybe it was two. I forget. Well, no,
22    actually I was a firefighter III for 11 -- subtract those
23    first two from 11 and a half and that's -- that's how many
24    years I was a firefighter III, so like a senior
25    firefighter.

Page 102

1  Q  That's the highest of the firefighter.....
2  A  Firefighter series, yes.
3  Q  Okay. So you would take 11 and a half years and
4     subtract.....
5  A  The -- five or.....
6  Q  Subtract maybe five -- up to five years?
7  A  Yeah.
8  Q  So about six years, six and a half?
9  A  Yes.
10 Q  And then what was your next rank?
11 A  Captain.
12 Q  And at the time of this fire you'd been a captain for
13    about a year?
14 A  Yes. Well, a little more than that.
15 Q  And you mentioned battalion earlier. There's three
16    battalions in Anchorage?
17 A  Correct.
18 Q  Do you know how many employees the whole fire
19    department has, approximately?
20 A  About 300.
21 Q  Do you know approximately how many captains there are?
22 A  There's about 20 -- about 60 -- about 60.
23 Q  And how many people above captain are there? What,
24    there's a battalion commander?
25 A  On each shift on the line, what we call on the line,

Page 103

1     there's three per shift. So nine above captain until you
2     start becoming, you know, like administrative chiefs and --
3     and that sort of thing.
4  Q  Okay. In photograph 10, I'm getting the picture from your
5     testimony that when you look at photographs you can see
6     evidence where things have been because of the lack of
7     certain things like that?
8  A  Correct.
9  Q  And do you see any evidence at all that other than that
10    one plug that's in that receptacle, do you see any
11    evidence in that photograph that any other plugs were in
12    that receptacle?
13 A  Not by looking at that picture you can't tell if anything
14    else had been there.
15 Q  Okay. And you were asked about surge protectors and
16    things like that. And isn't that part -- in part
17    what fuse boxes are for in a house?
18 A  In -- in part.
19 Q  Okay. Other than that outlet do you see any other
20    electrical outlets in the area?
21 A  Not that I can readily make out.
22 Q  Other than the fountain did you see any other electrical
23    appliances in the area?
24 A  I -- I don't remember seeing any other electrical
25    appliances.

Page 104

1  Q  Do you recall whether or not you had to lift the sofa to
2     take the fountain out?
3  A  No, I don't think we had to lift it. To get the fountain
4     out, no, the fountain was sitting on that end table thing.
5     So, no, we didn't have to lift it to get the fountain out.
6  Q  Okay. Now you testified that the investigators are called
7     when there's more than -- when -- I guess when you
8     determine that -- what appears to you to be more than
9     $100,000 worth of damage?
10 A  Correct.
11 Q  Is that structure or contents or just.....
12 A  $100,000 in -- in total. You know, they don't --
13    they don't try to hold us to that. But when -- when
14    you've had like major loss of the structure, you
15    know, and you're starting to guess it's in the
16    $100,000 range, that's -- that's one of the criteria.
17 Q  And here you didn't believe it got.....
18 A  No.
19 Q  .....quite to that extent.....
20 A  No.
21 Q  .....correct?
22 A  Correct.
23 Q  And then severe injury, fatality; you had no evidence that
24    there was either of that?
25 A  Correct.

Page 105

1  Q  And arson; and that's a criminal matter, correct?
2  A  Correct.
3  Q  Seeing no evidence of any one of -- you didn't see any
4     signs that there was anything criminal going on here, did
5     you?
6  A  No, I did not.
7  Q  In the absence of that -- satisfying those criteria for
8     calling in the fire investigator, is -- does the fire
9     department then entrust to you the obligation to determine
10    the fire's cause and origin?
11 A  Pretty much, yes.
12 Q  And that's based upon your experience and training?
13 A  Yes.
14 Q  And in this case, what, about 25 years at that time of
15    this fire, correct?
16 A  Total.
17 Q  Based upon your 25 years of training and experience, on a
18    more probable than not basis is it your opinion as the
19    investigator from station six that responded to this fire
20    was it your opinion that the fire was caused by the molten
21    glob of plastic or -- or was associated with that
22    fountain?
23    MR. GUTSCH: Objection, leading, foundation.
24 A  It was -- it was my opinion that the fire started in
25    that area and that in -- within that area one thing

Computer Matrix Court Reporters       PH - 907-243-0668              jpk@gci.net
                                      FAX - 907-243-1473             sahile@gci.net
                                      Exhibit    1
                                      Page  9  of  9